IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JHAVON GOODE, | § | |
| | § | No. 276, 2015 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1404008621A |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 17, 2016
Decided: April 4, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, and **SEITZ**, Justices.

Upon Appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

André M. Beauregard, Esquire, Brown, Shiels & Beauregard, LLC, Dover, Delaware, for Defendant Below, Appellant, Jhavon Goode.

Kathryn J. Garrison, Esquire, Department of Justice, Georgetown, Delaware, for Plaintiff Below, Appellee, State of Delaware.

**SEITZ**, Justice:

## I. INTRODUCTION

A Superior Court jury convicted Jhavon Goode of first degree assault, possession of a firearm during the commission of a felony, and carrying a concealed deadly weapon. The jury determined that Goode shot Jason Terry in the course of a drug sale in Milford, Delaware. The court sentenced Goode to a total of eighteen years at Level V incarceration with credit for time previously served.

Goode appeals his convictions and raises a number of arguments. For the reasons set forth below, we conclude that each of his arguments is without merit. With respect to Goode's primary argument—that Terry's identification of Goode should have been suppressed as unduly suggestive because Terry identified Goode only after Terry's cousin, Raye Boone, showed him a photograph of Goode—we hold that a state actor must play a role in an identification before due process concerns arise. If no state actor is involved in the identification, as was the case here, then the normal rules of evidence and procedure provide sufficient protection to the rights of the accused to challenge the identification. Accordingly, we affirm the Superior Court's judgment.

## II. FACTS AND PROCEDURAL HISTORY

On April 9, 2014, Jason Terry was walking home after playing basketball at a park in Milford, Delaware. Terry passed by 105 Montgomery Street, a house frequented by people who were known for drinking and generally carrying on. While walking by the house he ran into an acquaintance, Tiger Reynolds. Reynolds told Terry that a person behind the house wanted to buy marijuana. Evidently, Terry was someone known to

have marijuana on hand to sell. Intending to make a sale, Terry walked down the alley to the area behind 105 Montgomery Street to meet the prospective buyer.

Behind the house he encountered two men he did not recognize, one of whom was sitting in a car. The man in the car said he wanted to buy the marijuana. Terry approached him and took the drugs out of his pocket. As he did this, the man in the car pulled out a pistol from under his clothing and pointed it at Terry. Terry, shocked at having the gun pointed at him, asked the man if he was really going to rob him over seven grams of marijuana. The man then shot Terry two times.

Terry stumbled back to the street, where police and an ambulance arrived shortly and took him to the hospital. The shooter and the other man fled. They did not take the drugs. Although there were various individuals present in and around 105 Montgomery Street at the time of the shooting, they were all uncooperative when police questioned them about the shooter's identity.

Fortunately, the neighbors in the house next door witnessed and filmed portions of the episode, and were more forthcoming with police. One neighbor identified Jhavon Goode, whom he recognized from high school, as being present behind 105 Montgomery Street before the shooting. The neighbors also filmed Terry going down the alley before he was shot, men fleeing after the shooting, and the wounded Terry stumbling back up the alley after the shooting. The film also captured the sound of gunshots. The police recovered two shell casings from the ground near where the shooting occurred, but no weapon.

Terry was taken to the Milford Memorial Hospital, where Detective John Horsman questioned him. Detective Horsman had been among the first officers to arrive at the scene of the shooting. Although Terry could not identify the shooter by name, he said that he would be able to recognize the man if he saw him. The next day, Terry was moved to Christiana Hospital. During his second interview with the police there, Terry repeated to Detective Horsman that he would be able to identify the shooter if he saw his face.

After the second interview with the police, Terry's cousin Raye Boone showed Terry a picture of Jhavon Goode that she found on Facebook. According to Boone, Goode had been going around town bragging about shooting Terry.[1] After seeing the picture of Goode, Terry was sure Goode was the man who shot him. The police arrested Goode for the shooting after Terry identified Goode as the shooter based on the picture Boone showed to him.

Before trial Goode filed a motion *in limine* to exclude Terry's identification of Goode based on the photograph. Although Goode called it a motion *in limine*, the Superior Court treated it as a motion to suppress. The court denied the motion because a citizen rather than a State official showed Terry the photograph. The Superior Court decided that an identification based on a photograph supplied by non-state actors, such as

---

[1] There is some confusion in the record about how many individuals had been bragging about shooting Terry. At one point, Terry testified that Boone showed him Goode's picture and said: "These were the boys in the area; that they said they shot you, and she showed me a picture." App. to Answering Br. at 26. It was not made clear if Terry had been shown pictures of more than one individual or if the picture he was shown contained more than one person in it.

4

friends or relatives, would be admissible, even if it might not be admissible if orchestrated by the police.

A Superior Court jury heard the case from January 12 to 15, 2015. Terry, Detective Horsman, the neighbors, and several other witnesses testified. Boone did not testify. After the close of the evidence, the trial judge read the jury the standard instruction on the burden of proof beyond a reasonable doubt. During their deliberations, the jury asked for additional clarification on the meaning of proof beyond a reasonable doubt. After considering the jury's request, counsel for the parties and the court agreed that it would be problematic to deviate from the standard instruction. With the agreement of counsel, the trial judge re-read the standard instruction. The court also informed the jury that it was the standard instruction approved by the Delaware Supreme Court, and that trial judges do not vary the instructions. Half an hour later, the jury returned a guilty verdict for the charges of first degree assault, possession of a firearm during the commission of a felony, and carrying a concealed deadly weapon. The court set a sentencing date of March 13, 2015.

After trial but before sentencing, the gun used in the shooting was found in a safe in the woods under unusual circumstances. [2] Although the gun was corroded,

---

[2] The gun was discovered on January 19, 2015 in the woods near Milford, a few miles from Goode's house, by "some random civilian who happened to be walking through the woods and found a safe, kind of, sitting up against a tree, . . . and brought it home; cracked it open; and found a loaded gun inside." Hearing Transcript at 8, *State v. Goode*, Cr. ID No. 1404008621A (Del. Super. May 26, 2015). The gun was not linked to this case until, several months after its discovery, the State Police conducted the standard testing that they do on all recovered firearms. *Id.* at 9–10. The testing linked the shell casings found at the scene of the crime to the gun found in the woods. *Id.*

investigators were able to identify it as the gun used in the shooting because it matched the shell casings found at the crime scene. The parties and the court agreed that further testing should be done on the weapon.

The court continued Goode's sentencing on April 23, 2015 to permit Goode to do additional testing and if warranted to file a motion for a new trial. By the time of the next status conference on May 26, 2015, the defense still had not filed a motion for a new trial. To prevent further delay and recognizing the diminishing possibility that Goode would file a motion for a new trial, the Superior Court proceeded with sentencing. The court noted that if testing yielded some result that might entitle Goode to a new trial, he could appeal to this Court and have his concerns addressed on remand. The court then sentenced Goode on May 29, 2015 to a total of eighteen years at Level V incarceration with credit for time previously served. This appeal followed.

### III. ANALYSIS

Goode makes five arguments on appeal. First, he argues the Superior Court should have suppressed Terry's identification of Goode based on the photograph shown to him by Terry's cousin, Raye Boone, because the identification procedure was overly suggestive and therefore constitutionally infirm. Next, Goode argues the State's failure to reveal Boone's identity earlier than it did amounted to a *Brady* violation and a violation of Superior Court Criminal Rule 16, and also a violation of the Confrontation Clause. Third, Goode argues there was insufficient evidence to convict him. Fourth, Goode argues the jury convicted him on a lesser standard of proof than "beyond a reasonable doubt" because it asked for an instruction clarifying the burden of proof, and

6

the court merely repeated the standard instruction that it had given previously. Finally, Goode contends that the Superior Court should have granted a continuance of his sentencing after the discovery of the weapon used to shoot Terry, so that he could test it and move for a new trial. We address each of Goode's arguments in turn.

### A. The Superior Court Did Not Err When It Declined To Suppress Terry's Identification Of Goode

Terry identified Goode as the shooter based on a Facebook photograph that Boone showed Terry. According to Goode, Terry's identification should have been suppressed as unduly suggestive and therefore a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We review constitutional claims *de novo*.[3] After a careful review of the record and the parties' legal arguments, we follow the United States Supreme Court's decision in *Perry v. New Hampshire*,[4] and hold, as did the trial judge, that the Due Process Clause does not require a preliminary inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by a state actor.

As the United States Supreme Court has explained, the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."[5] Apart from the rights guaranteed by the Sixth Amendment, such as the right to counsel,

---

[3] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[4] 132 S. Ct. 716 (2012).
[5] *Id.* at 723.

compulsory process, and the confrontation and cross-examination of witnesses, the Supreme Court has recognized that "state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial."[6] Only when the State resorts to evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice" does the Due Process Clause act as a restraint on its admission into evidence.[7]

Even when police use suggestive and unnecessary identification procedures, suppression is not automatic.[8] Instead, "the Due Process Clause requires the courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"[9] Applying a totality of the circumstances approach, when the "'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed."[10] If not, and if the evidence is admissible in all other respects, it should be submitted to the jury.

---

[6] *Id.*

[7] *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[8] *See id.* at 724 ("Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." (citing *Manson v. Brathwaite*, 432 U.S. 98, 112–13 (1977))); *Younger v. State*, 496 A.2d 546, 550 (Del. 1985) ("That a confrontation is suggestive, without more, . . . cannot amount to a due process violation; the unnecessarily suggestive identification procedure must also carry with it the increased danger of an irreparable misidentification."); *see also Monroe v. State*, 28 A.3d 418, 432–35 (Del. 2011).

[9] *Perry*, 132 S. Ct. at 724 (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

[10] *Id.* at 725 (quoting *Brathwaite*, 432 U.S. at 116); *Younger*, 496 A.2d at 550 ("[I]f the Court determines under the totality of circumstances that a line-up is impermissibly suggestive, but nonetheless reliable, evidence of the confrontation will not be excluded at trial.").

8

In *Perry*, the United States Supreme Court noted that improper police action was an essential predicate to its prior decisions addressing eyewitness identification procedures and due process limitations. According to the Court, any other rule "would open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications."[11] The Supreme Court also acknowledged the fallibility of eyewitness identifications, but concluded that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing a jury to assess its creditworthiness."[12] Rather, a defendant's Sixth Amendment rights, an effective defense attorney's cross-examination, eyewitness specific jury instructions, the constitutional requirement that the government prove guilt beyond a reasonable doubt, and rules of evidence provide adequate safeguards to a fair trial without the need to resort to a preliminary due process analysis by the trial judge.[13]

We follow the Supreme Court, and the majority rule,[14] and hold that some state actor must be involved in procuring a suggestive identification before requiring the trial court to undertake a preliminary due process analysis. As the Court noted in *Perry*, its

---

[11] *Perry*, 132 S. Ct. at 727.

[12] *Id.* at 728.

[13] The *Perry* Court noted that trial courts have the discretion to exclude evidence when its prejudicial impact outweighs its probative value under Federal Rule of Evidence 403 and comparable state rules. *Id.* at 729. The Court also recognized the possibility of admission in appropriate cases of expert testimony on the hazards of eyewitness identification evidence. *Id.*

[14] Lynn M. Talutis, *Admissibility of In-Court Identification as Affected by Pretrial Encounter that Was not Result of Action by Police, Prosecutors, and the Like*, 86 A.L.R.5th 463 (Originally published in 2001) ("The majority of courts require that an allegedly suggestive pretrial encounter be the result of either police or prosecution action to have an effect on the admissibility of in-court identification.").

prior cases in the identification area dealt with remedies "when the police use an unnecessarily suggestive identification procedure."[15] In addition to concerns about the reliability of the identification, deterring police misconduct when undertaking identifications motivated the Court's due process analysis.[16] Such policy considerations are absent when private actors stage the identification. We also recognize the inefficiency in a trial setting of requiring a preliminary due process analysis for private identifications, which would require "judicial preview . . . of most, if not all, eyewitness identifications."[17] As the Supreme Court observed in *Perry*, a defendant still has the necessary tools and procedural protections to counter unfair or unreliable identification procedures.[18]

Turning to the case before us, Terry identified Goode based on the photograph his cousin found on Facebook. The police were not involved in the identification, which ends the constitutional inquiry. We also note that Goode availed himself of all the procedural protections available to ensure a fair trial. The court appointed counsel for

---

[15] 132 S. Ct. at 726 (emphasis omitted).

[16] *Id.*

[17] *Id.* at 727.

[18] *Id.* at 728–29. Goode relies on a handful of decisions extending due process protections to identifications not involving state actors. *See Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986); *State v. Atwood*, 832 P.2d 593, 620 (Ariz. 1992), *disapproved of by State v. Nordstrom*, 25 P.3d 717, 729 (Ariz. 2001); *Commonwealth v. Jones*, 666 N.E.2d 994, 1000–001 (Mass. 1996); *People v. Walker*, 411 N.Y.S.2d 156, 158–59 (Westchester Cnty. Ct. 1978). All of the cases predate the Supreme Court's decision in *Perry*. Goode also argues that this Court should extend due process protections under the Delaware Constitution to identifications not involving state actors. We decline to do so. Generally, "Delaware constitutional due process is coextensive with federal constitutional due process," and in the area of due process this Court ordinarily defers to the judgment of the "highest court in the land, if the point at issue has been decided by that Court." *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del. 2011) (quoting *Gen. Elec. Co. v. Klein*, 106 A.2d 206, 210 (Del. 1954)).

10

Goode, who attempted through cross-examination to undermine the credibility and reliability of Terry's identification.[19] The court instructed the jury that to convict they must find beyond a reasonable doubt that it was, in fact, Goode who shot Terry. In addition, Goode's counsel argued strenuously that Terry's identification was unreliable.[20] Goode also elected not to call Boone as a witness, which was within counsel's strategic discretion.[21] Accordingly, the Superior Court correctly declined to suppress Terry's identification of Goode.

---

[19] Trial Transcript Volume C at 68 ("Q: Regardless, [Boone] shows you the picture and she implies that this is the person that shot you, correct? A: No . . . ."). In Goode's counsel's opening statement, he remarked to the jury:

> [T]his case is going to be about identification, and more to the point misidentification. . . . On the day he was shot [Terry said] "I don't know [who shot me.] I never saw the guy." The following day he identifies [Goode.] In the interim what happens is a family member comes to him and shows him a picture on a cell phone, and he says, "This is the guy who shot you."

Trial Transcript Volume B at 18–19.

[20] Goode's counsel made the following argument in his closing statement:

> The day after the shooting, [Terry] doesn't know who shot him. . . . Day two, before Detective Horsman even makes contact with him, a family member comes to him with a picture; puts it in his face; and says, That's the guy who shot you. . . . Word on the street is, this shot you [sic]. Now, that's the guy who shot me.

Trial Transcript Volume D at 42. Goode's counsel also argued:

> You may have heard of . . . these death row exonerations based on DNA. A large majority of those initial convictions are from misidentifications or identification cases that are eventually reversed through DNA. So then you have Mr. Terry come in and testify that he's absolutely sure, but realistically—I mean, how much credibility do you put into that identification?

*Id.* at 46; *see also id.* at 49 ("[I]s Jason Terry's ID accurate? Did he really see the shooter or is he going from the picture that he was shown?").

[21] *See Outten v. State*, 720 A.2d 547, 557 (Del. 1998) ("Whether to call a witness, and how to cross-examine those who are called are tactical decisions.").

## B. The State's Delayed Disclosure Of Goode's Identity Was Not A *Brady* Violation

Goode next argues that the State's failure to disclose the identity of Terry's cousin Raye Boone was a *Brady* violation. Specifically, Goode argues the State violated Superior Court Criminal Rule 16 and violated *Brady* by not immediately disclosing Boone's identity. Goode also argues that allowing Detective Horsman and Terry to testify about Boone's statements violated the Confrontation Clause. This Court generally reviews properly preserved claims of constitutional error *de novo*.[22] Because Goode did not preserve this claim of error below, we review for plain error.[23] "To constitute plain error, an error must be 'so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.'"[24]

### 1. The State Had No Discovery Obligation To Reveal Boone's Identity Before The *In Limine* Hearing

First, the State did not violate Superior Court Criminal Rule 16.[25] Rule 16(a)(1)(C) provides that:

> Upon request . . . the state shall [provide] books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession . . . of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial . . . .

---

[22] *Ploof*, 75 A.3d at 820; *Nance v. State*, 903 A.2d 283, 285 (Del. 2006).

[23] *Nance*, 903 A.2d at 285.

[24] *Id.* at 285–86 (quoting *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002)).

[25] Goode also argues the State violated its duty to preserve evidence by not preserving Boone's identity. The State never failed to preserve Boone's identity—in fact, it eventually disclosed her identity during the motion *in limine* hearing.

As the law now stands, Rule 16 does not require the State to disclose the identity of its witnesses prior to trial[26] or to provide a "complete and detailed accounting . . . of all police investigatory work on a case."[27]  Goode knew that Terry identified him with the help of a "family member who wished to stay anonymous."[28]  Although options were available, Goode never pressed the State for the relative's identity or for any evidence related to the identification.[29]  Nor did the State use Boone or the identification as "evidence in chief"—instead, it relied on Terry's in-court identification of Goode as the shooter and the fact that he was certain Goode was the person who shot him.[30]  Goode has also not shown how Boone's identity was "material" to his defense.  Accordingly, the State did not violate Rule 16.

### 2. *The State Did Not Violate* Brady *By Its Delayed Disclosure Of Boone's Identity*

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ."[31]  The defense must establish three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or

---

[26] *Davis v. State*, 99 A.3d 226, 2014 WL 3943100, at *3 (Del. Aug. 12, 2014) (Table); *Liket v. State*, 719 A.2d 935, 937 (Del. 1998) ("When the testimony or background of a witness offers no exculpatory value, the State does not have to disclose the identity of that witness prior to that witness' testimony.").

[27] *Lovett v. State*, 516 A.2d 455, 472 (Del. 1986) (quoting *Moore v. Illinois*, 408 U.S. 786, 795 (1972)).

[28] App. to Answering Br. at 11.

[29] *See* Super. Ct. Crim. R. 16(a)(1)(C) (providing that, "upon request," defendants are entitled to certain evidence in the possession of the State).

[30] App. to Answering Br. at 58–59.

[31] 373 U.S. 83, 87 (1963).

because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[32]

While Boone's identity could arguably have been used for some impeachment purpose, the State did not suppress her identity and no prejudice resulted.  The police report provided to Goode under Rule 16(a)(1) stated: "The victim was able to identify the suspect through the photographed [sic] provided to him from a family member who wished to stay anonymous."[33]  As noted earlier, Goode did not ask the State to reveal the identity of the family member or file any motion seeking the identity of the family member.

Goode also argues that the State belatedly disclosed Boone's identity on the eve of trial.  "When a defendant is confronted with delayed disclosure of *Brady* material, reversal will be granted only if the defendant was denied the opportunity to use the material effectively."[34]  Once again, Goode did not ask for the identity of the person who supplied the photograph, despite knowing as early as June 5, 2014 that such a person existed.  Goode *did* learn of Boone's identity at the January 12, 2015 hearing on his motion to suppress the identification, yet he did not ask for a continuance or otherwise claim that the late disclosure caused prejudice to the defense.  At trial, Goode cross-examined Terry on the details of Boone's role in his identification, and had every

---

[32] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).
[33] App. to Answering Br. at 11.
[34] *Rose v. State*, 542 A.2d 1196, 1199 (Del. 1988) (citing *United States v. Johnston*, 784 F.2d 416, 425 (1st Cir. 1986)).

14

opportunity to undermine and cast doubt on the validity of the identification. Goode has therefore failed to demonstrate a *Brady* violation.

### 3. *Goode's Rights Under The Confrontation Clause Were Not Violated*

Finally, the State did not violate the Confrontation Clause by presenting Boone's testimony through Terry and Detective Horsman. In certain situations the Confrontation Clause prohibits the use of testimonial hearsay in criminal trials.[35] But Detective Horsman never testified to anything that Boone said. Although Terry did begin to repeat things that Boone had said, the Superior Court quickly halted the testimony and instructed the jury to disregard his statements.[36] In this situation, the trial judge's prompt instruction for the jury to disregard the statements cured any error.[37] Further, it was Goode who later on cross-examination elicited testimony about what Boone said.[38] Goode has thus waived any claim that his rights under the Confrontation Clause were violated.[39]

---

[35] *Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *Wheeler v. State*, 36 A.3d 310, 317–18 (Del. 2012).

[36] App. to Opening Br. at 41–42.

[37] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) ("A trial judge's prompt curative instructions 'are presumed to cure error and adequately direct the jury to disregard improper statements.'" (quoting *Pena v. State*, 856 A.2d 548, 551 (Del. 2004))).

[38] App. to Opening Br. at 42-2–43.

[39] *See United States v. Lopez-Medina*, 596 F.3d 716, 733 (10th Cir. 2010) ("[T]here is no Confrontation Clause violation when the defendant opens the door to the admission of hearsay testimony."); *Janosky v. St. Amand*, 594 F.3d 39, 48 (1st Cir. 2010) (holding that defendants may waive Confrontation Clause rights); *see also Bentley v. State*, 930 A.2d 866, 876 (Del. 2007) (defendants waive the right to object to potentially inadmissible evidence when they bring such evidence into issue).

## C. The State Presented Sufficient Evidence To Support Goode's Conviction

Goode next argues that the State presented insufficient evidence to convict him. When evaluating sufficiency of the evidence claims, this Court must ask if, considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[40] Goode's evidentiary sufficiency argument relies primarily on the premise that Terry's identification was improper. Goode's conviction relied heavily on Terry's assertion that he was "one-hundred percent . . . sure" Goode was the person who shot him.[41] It was also based on the corroborating testimony of the neighbor that placed Goode at the scene just before the shooting. Because the trial court properly admitted Terry's identification, a rational jury could have believed Terry beyond a reasonable doubt when he said, repeatedly and with conviction, that he remembered the face of the man who shot him, and that the shooter was Goode.

## D. The Superior Court Properly Instructed The Jury On The Beyond A Reasonable Doubt Standard

Goode contends the jury convicted him using a standard less than beyond a reasonable doubt because the jury asked the court during deliberations to give further clarification on that standard, and the court repeated the same standard instruction it had given previously. According to Goode, this means the jury never had its confusion resolved and must have convicted him under a lesser standard.

---

[40] *Robinson v. State*, 953 A.2d 169, 173 (Del. 2008).
[41] App. to Opening Br. at 42.

The State had the burden to prove every element of the crimes charged beyond a reasonable doubt before the jury could convict Goode,[42] and the jury needed to be instructed on the meaning of that standard.[43] "A trial judge's instructions to the jury are not a basis for reversal if they are reasonably informative and not misleading by common standards of verbal communication."[44] The jury was read—twice—an instruction approved by this Court.[45] It does not follow that because the jury requested clarification and the court repeated the instruction, the jury was unable to understand it after hearing it a second time and engaging in additional reflection. Juries are presumed to be able to understand and follow instructions,[46] and there is nothing to suggest this case is an exception. Goode's counsel also agreed that the re-reading of the instruction was an appropriate response to the jury's question. Goode's argument is thus without merit.

**E. The Superior Court Did Not Err By Declining To Continue Goode's Sentencing**

Finally, Goode argues that the Superior Court abused its discretion by denying his request to continue sentencing to allow additional time to test the gun found in the safe in the woods after his conviction. Whether to grant a continuance is left to the discretion of

---

[42] *Mills v. State*, 732 A.2d 845, 849–50 (Del. 1999).

[43] *Id.* at 851 ("We adhere to the view that it is desirable to define reasonable doubt for the jury in a criminal proceeding.").

[44] *Id.* at 849.

[45] *See, e.g.*, *Keyser v. State*, 893 A.2d 956, 960 (Del. 2006) (endorsing reasonable doubt instruction nearly identical to Goode's); *Mills*, 732 A.2d at 852–53 (same); *see also id.* at 852 ("Justice Ginsberg [has stated of the relevant instruction that] 'this model instruction surpasses others I have seen in stating the reasonable doubt standard succinctly and comprehensively.'" (quoting *Victor v. Nebraska*, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring))).

[46] *See Taylor v. State*, 76 A.3d 791, 802 (Del. 2013) (holding the jury was presumed to have been able to understand and comply with a limiting instruction); *Forrest v. State*, 721 A.2d 1271, 1276 (Del. 1999) (same).

17

the trial judge.[47]  A trial judge's decision to grant or deny a continuance is an abuse of discretion only if it is clearly unreasonable or capricious.[48]

When the Superior Court denied Goode's request for a continuance, he had been convicted and the court wished to move the case along without further delay.  The court had already granted Goode a continuance so that he could file a motion for a new trial. Goode never filed the motion.  In addition, the Superior Court noted that in the unlikely event that something fruitful did come from the testing, Goode would have the opportunity to seek remand from this Court to address the issue.  The Superior Court did not act unreasonably or capriciously in denying Goode a continuance, and therefore did not abuse its discretion.

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is affirmed.

---

[47] *Cooke v. State*, 97 A.3d 513, 528 (Del. 2014).
[48] *Id.*

18