IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAQUAN CRUMP, | § | |
| | § | |
| Defendant Below, | § | No. 290, 2018 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 1707005117 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: December 28, 2018
Decided: February 7, 2019

Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## O R D E R

After consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) In February 2018, a Superior Court jury found the defendant-appellant, JaQuan Crump, guilty of Assault in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony. The Superior Court sentenced Crump to twenty years in prison, suspended for decreasing levels of supervision after five years, for each offense. This is Crump's direct appeal.

(2) The evidence presented at trial reflects that around midnight on July 8, 2017, Brandy Gross was outside of Irish Mike's, a bar on Loockerman Street in Dover, when Crump, whom she had known for approximately five years,

approached her. Gross and Crump argued, and he punched her in the face, knocking her to the ground. Gross testified that Crump was angry because Gross had recently told him that she did not want a romantic relationship with him. After Crump punched her, Gross borrowed a friend's phone in order to report the assault. Crump then stabbed her in the back with a knife and ran away. The knife remained in Gross's back. A friend drove Gross to the hospital, where the knife had to be surgically removed. Gross had three stab wounds and a punctured lung; she remained in the hospital for approximately one week.

(3) Corporal Derrick Mast of the Dover Police Department was one of the officers who responded to the scene of the incident. Shortly after arriving at the scene, he learned that the victim had gone to the hospital with stab wounds. Corporal Mast went to the hospital emergency room and located Gross in a trauma bay with the knife protruding from her back. Gross identified Crump as her assailant. Approximately ten days later, Crump was apprehended in a vacant house in Dover.

(4) A public defender was appointed to represent Crump. Shortly before trial was scheduled to begin, Crump requested to waive his right to counsel based on disagreements between Crump and his attorney concerning the defense. After a colloquy, the Superior Court granted Crump's request and allowed him to proceed *pro se*. The Court ordered Crump's former counsel to remain as standby counsel.

2

(5)     Crump raises six issues in his *pro se* opening brief on appeal.  First, he contends that his right to *Brady*[1] material was violated because he was not permitted to inspect Gross's medical records before or during trial.  Second, Crump argues that the State committed a *Brady* violation when it failed to disclose that, before Crump's trial, one of the police officers who had investigated the stabbing was placed on administrative leave after being arrested for driving under the influence of alcohol.  Third, he asserts that the prosecutor committed various forms of prosecutorial misconduct.  Fourth, Crump argues that the testimony of a witness who authenticated a surveillance video during the trial constituted impermissible opinion testimony by a lay witness.  Fifth, he contends that the Court's decision to permit certain increased security measures during closing arguments was prejudicial.  Sixth, Crump argues that, even if none of the foregoing arguments justifies reversal on its own, they constitute "cumulative error" warranting reversal.  We address these issues in order.

(6)     This Court generally reviews properly preserved claims of constitutional error *de novo*.[2]  Because Crump did not preserve any of his claims of error below, we review for plain error.[3]  To constitute plain error, an error must be

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Goode v. State*, 136 A.3d 303, 312 (Del. 2016).

[3] *Id.*

3

so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[4]

*The Victim's Hospital Records*

(7)     Crump's first argument on appeal is that the State's and the Superior Court's refusal to allow him to inspect the hospital records relating to the victim's treatment following the stabbing violated his right to *Brady* material, the Confrontation Clause, and Superior Court Criminal Rule 16.

(8)     Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."[5]  In order to demonstrate a *Brady* violation, the defendant must establish three elements:  the evidence is favorable to the accused because it is either exculpatory or impeaching; the State suppressed the evidence, either willfully or inadvertently; and the defendant was prejudiced.[6]

(9)     Crump contends that the hospital records are favorable because they might have allowed him to impeach Gross's testimony in order to demonstrate that she suffered only "physical injury" sufficient to support a conviction for second-

---

[4] *Id.*

[5] 373 U.S. at 87.

[6] *Goode*, 136 A.3d at 312-13 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

degree assault, rather than the "serious physical injury" necessary to support a conviction for first-degree assault. Specifically, he argues that Gross testified during direct examination that she was in the hospital for "four weeks" following the stabbing and then, in response to the very next question, indicated that she was in the hospital for one week. Viewing the testimony as a whole, the Court concludes that the hospital records would not have been useful for impeachment purposes. The records, which show that Gross was in the hospital for one week, were admitted into evidence; other than the single reference to "four weeks" in the transcript, which may have been a simple misstatement or a transcription error, there was no suggestion that she spent more than one week in the hospital.[7] If the statement were significant, Crump could have cross-examined Gross about her purportedly inconsistent testimony, but he did not.

(10) The State also did not suppress the records. The State produced the records to Crump's attorney when Crump was still represented by counsel.[8] And

---

[7] *See Robinson v. State*, 2016 WL 5957289, at *3 (Del. Oct. 13, 2016) ("Officer Cumming's testimony that she heard [a witness] shout 'they killed Cam and *she* shot him for some pills' is nothing more than a typographical error. There was no evidence that a female was present during the incident. Had Officer Cummings actually said 'she' rather than 'he,' counsel on both sides would have explored the statement further. Throughout the entire case, the witnesses consistently testified that three men were involved in the drug transaction and shooting.").

[8] *See id.* (holding that there was no suppression where the prosecutor disclosed to the defendant's counsel favorable information that she received during trial as soon as she received it). Crump's reliance on *Wright v. State*, 91 A.3d 972 (Del. 2014), for the proposition that disclosure to Crump's former counsel was insufficient when Crump later became *pro se* because a prosecutor must "insure communication of all relevant information on each case to every lawyer who deals with it in order to discharge the government's *Brady* responsibility," Op. Br. at 13, is misplaced. *Wright*

during the Court's colloquy with Crump regarding his decision to represent himself, the Court warned Crump that, as a *pro se* defendant, he would not be entitled to receive the hospital records. Crump did not object, and in fact conceded that he had "checked with the law library" and determined not to seek to be permitted to review the hospital records.[9] The records were also admitted into evidence at trial without objection from Crump, and Crump stipulated to their authenticity.[10] Because the hospital records were not favorable impeaching evidence and were not suppressed, the Court concludes that there was no *Brady* violation.

(11) To the extent that Crump's Confrontation Clause argument differs from his *Brady* argument, we find it meritless. Crump does not identify a witness that he did not have the opportunity to confront, nor does he explain why admission of the hospital records, which he stipulated were authentic, violated the Confrontation Clause. Admission of hearsay statements does not violate the Confrontation Clause if the evidence falls within a firmly rooted hearsay exception or contains

---

and the cases cited therein address whether one prosecutor may be imputed with the knowledge of *Brady* information known to others acting on the government's behalf, not whether a prosecutor must redisclose *Brady* material to a defendant's new counsel or to a defendant who later elects to represent himself.

[9] Tr. of Colloquy, Jan. 10, 2018, at 8-9.

[10] Tr. of Trial, Feb. 6, 2018, at B-5, B-9.

6

particularized guarantees of trustworthiness.[11]  Crump does not suggest that the

hospital records were not trustworthy, and they were admissible under a firmly

rooted hearsay exception.[12]

(12)   Finally, Crump's claim that the State violated Superior Court Criminal

Rule 16 also does not provide a basis for reversal.  The State provided the hospital

records to Crump's counsel.  Crump conceded at his *pro se* colloquy that he could

not review the records and later stipulated to their admissibility.  We find no plain

error with respect to the production or admission of the hospital records.

*The Internal Affairs Investigation*

(13)   Crump's second argument on appeal is that the State violated his right

to *Brady* material by failing to disclose to Crump that Keith Boris, one of the officers

who investigated the stabbing, was later placed on administrative leave, and by

calling Officer Boris's supervisor, rather than Boris, to testify at trial.

(14)   Officer Boris was a trainee on the Dover Police force when he and his

field training officer, Corporal Mast, responded to the scene of the stabbing outside

Irish Mike's and then to the hospital where Gross had been taken.[13]  They spoke to

---

[11] *McGriff v. State*, 781 A.2d 534, 538 (Del. 2001).

[12] DEL. R. EVID. 803(6) (records of a regularly conducted activity); DEL. R. EVID. 803(4) (statements made for purposes of medical treatment).

[13] Tr. of Trial, Feb. 6, 2018, at B-35, B-40-41.

7

witnesses and collected the knife after it was removed from Gross's back by hospital personnel.[14]  Corporal Mast asked Gross who had stabbed her, and she identified Crump.[15]  Officer Boris prepared the report of the stabbing investigation, but he did not testify at Crump's preliminary hearing or at trial.   On or about January 11, 2018, approximately six months after the stabbing and approximately four weeks before Crump's trial began, Officer Boris was involved in an alleged drunken driving and hit-and-run incident.  He was placed on administrative leave pending an internal affairs investigation.  The *Delaware State News* reported the incident on January 16, 2018, approximately three weeks before Crump's trial.  Corporal Mast, but not Officer Boris, testified at Crump's trial.

(15)   We conclude that there was no plain error.  Even assuming that information concerning Officer Boris's arrest and an incomplete internal affairs investigation was favorable under *Brady* and that it was suppressed by the State, there was no prejudice.  Evidence of Boris's arrest and investigation would not have been admissible for the purpose of impeaching Officer Boris, if he had testified,

---

[14] *Id.* at B-53-55, B-67.

[15] *Id.* at B-42-43.

because he had not been convicted.[16] It also was not admissible for the purpose of impeaching Corporal Mast's testimony.[17]

(16) Nor was it plain error for the State to call Corporal Mast but not Officer Boris. The State generally may select which witnesses to call during the presentation of its evidence.[18] It need not call witnesses whose testimony would be merely cumulative.[19] Corporal Mast was Officer Boris's supervising officer on the night of the stabbing and testified that he was with Officer Boris when Boris placed the knife into evidence packaging and every time Boris was speaking with witnesses.[20] It is not clear what non-cumulative testimony Officer Boris could have offered. Moreover, it appears that the police report that Officer Boris prepared was produced

---

[16] *See Gist v. State*, 1987 WL 38069, at *3 (Del. July 10, 1987) ("Evidence of arrest or indictment has been widely regarded as inadmissible for the purpose of impeaching a witness in criminal cases because arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty." (internal quotations omitted).

[17] *See Dollard v. State*, 838 A.2d 264, 267 (Del. 2003) ("Rule 609(a) does not permit the impeachment of a witness through evidence of another person's convictions . . . .").

[18] *See Cooper v. State*, 453 A.2d 800, 801 (Del. 1982) ("[T]he State is usually entitled to prove its case through witnesses it chooses . . . .").

[19] *Cf. Harris v. State*, 2014 WL 3888254 (Del. Aug. 7, 2014) (finding no plain error where prosecutor told the jury during opening statement that they would hear from a witness whose child found a gun in their yard but then prosecutor did not call that witness because the "additional testimony would have been largely cumulative").

[20] Tr. of Trial, Feb. 6, 2018, at B-54, B-67.

9

to the defense—if Crump wanted to call Officer Boris as a witness, he could have done so.

*Prosecutorial Misconduct*

(17)   As his third claim of error, Crump argues that the prosecutor engaged in misconduct.  Specifically, Crump claims that the prosecutor misled the Court and the jury about Corporal Mast's role in the investigation, elicited false testimony from a witness by asking leading questions, incorrectly stated during her closing argument that three witnesses had identified Crump as the perpetrator, and asked the jury to find the defendant guilty.

(18)   We find no plain error with respect to any of these arguments.  Crump's assertion that the prosecutor misled the Court about Corporal Mast's role is not supported by the record.  To the extent that the prosecutor asked leading questions, the number of such questions was minimal and Crump did not object.[21]  Moreover, Crump's claims that certain witnesses testified falsely are based on purported inconsistencies in the evidence.  But it was within the province of the jury to assess the witnesses' credibility and to determine whether any inconsistencies created a

---

[21] *Fields v. State*, 2005 WL 3200359 (Del. Nov. 28, 2005).

reasonable doubt as to Crump's guilt. We also find no error in the prosecution's asking the jury to find the defendant guilty.[22]

(19) Crump's assertion that the prosecutor incorrectly stated that three eyewitnesses identified Crump as the perpetrator also fails to demonstrate plain error. Crump contends that Devon Wilson, one of the eyewitnesses who testified at trial, did not identify Crump. The record reflects that Wilson testified that he had seen Crump, whom Wilson recognized but did not know by name, sitting with a group of people on a ledge outside Irish Mike's on the night of the stabbing, and that Wilson had given cigarettes to people in the group a number of times during the evening.[23] Wilson further testified that he saw Gross involved in a physical altercation with one of the people who had been sitting on the ledge.[24]

(20) To the extent that Wilson's testimony fell just short of explicitly identifying Crump as Gross's assailant, we find that the prosecutor's implicit suggestion during closing arguments that Wilson identified Crump did not rise to the

---

[22] *Cf. Spence v. State*, 129 A.3d 212, 228-29 (Del. 2015) (holding that State's use during its closing argument of a slide that displayed the words "[t]he defendant is guilty of all the charges against him" was improper but did not rise to the level of plain error, and suggesting that the impropriety would have been cured by the use of a qualifier, such as "the evidence demonstrates" that "the defendant is guilty").

[23] Tr. of Trial, Feb. 5, 2018, at A-58-59, A-62-63, A-65-66.

[24] *Id.* at A-59, A-66.

11

level of prosecutorial misconduct.[25] The prosecutor's statement that Wilson had identified Crump as the perpetrator was a rational inference from the evidence presented.[26] In any event, any error was not unduly prejudicial. The identification of Crump as the perpetrator was not close: Gross and her best friend, Shunaira Bowers, both identified Crump as Gross's attacker; Gross testified that she and Crump had been friends for approximately five years; Bowers testified that she was familiar with Crump because she had previously seen Crump and Gross together; and Crump did not present any evidence or elicit any testimony that called his identification into question.[27]

*Testimony of Surveillance Video Owner*

(21) Crump next argues that the Superior Court erred by allowing Samuel Chick—a local business owner who provided the State with surveillance video of the street near Irish Mike's from the night of the stabbing—to testify regarding who

---

[25] *See Jones v. State*, 2015 WL 6941516, at *2 (Del. Nov. 10, 2015) ("This Court's review of prosecutorial misconduct requires a two-step analysis. First, we determine whether misconduct has occurred. If it has not, our analysis ends. If it has, then we must analyze the misconduct under the framework outlined in *Hughes v. State* to determine whether it unduly prejudiced the defendant and thus amounted to reversible error. In *Hughes*, this Court adopted a three-factor balancing test to determine whether prosecutorial misconduct prejudiced the defendant such that it justifies reversal: '(1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error.'" (citations omitted)).

[26] *See id.* (closing arguments may include statements that are supported by the evidence presented or are direct, rational inferences from the evidence presented).

[27] Tr. of Trial, Feb. 5, 2018, at A-70-73, A-77-78.

12

he "thought" committed the crime. Crump contends that the testimony constituted opinion testimony by a lay witness because Chick was not a witness to the crime and therefore had no basis on which to identify the perpetrator. Crump did not object to Chick's testimony at trial, and he chose not to cross-examine Chick.

(22) Chick owned a business near Irish Mike's. He testified that on the morning of July 8, 2017 he heard that there had been an incident near the front of his shop overnight.[28] Chick went outside and saw blood on the sidewalk.[29] He then began reviewing the video from his surveillance cameras.[30] He stated that he identified a time on the video when he "saw police officers walking up and down the street."[31] Chick testified that he then "went back in the video to see how far back I could see" "the person who I think committed it."[32] Once he "saw the person who I thought perpetrated the stabbing sitting on the stoop, coming up and sitting down," he "took the clip" of the video and provided it to the police.[33] The video and certain

---

[28] Tr. of Trial at B-11.

[29] *Id.*

[30] *Id.* at B-12.

[31] *Id.* at B-13.

[32] *Id.* at B-19.

[33] *Id.* at B-13. *See also id.* at B-19-20 (Q: "[A]t this point on the screen the individuals who are sitting and standing and sitting on your stoop/planter box have moved away and there's now two people standing to the right and one standing to the left . . . is that the same person that you had tracked from the beginning to the end of making this surveillance?" A: "Yeah. The person who

13

still photos that were created from the video were admitted into evidence. The stabbing was captured on those images, though the perpetrator's face is obscured.

(23) Chick did not testify that Crump was the perpetrator. He merely explained that he determined where to begin the video excerpt by looking at the characteristics of the person shown on the video to be the perpetrator and reviewing the tape backward in time until Chick first saw that person on the video. To the extent Chick's testimony even constituted an opinion, it was not inadmissible because it did not identify Crump as the perpetrator, was limited to explaining how Chick clipped the video based on his observations about the images on the video, and was not based on any specialized knowledge.[34]

(24) Moreover, even if Chick's testimony was an inadmissible lay opinion, its admission would have been harmless. The jury viewed the video and could make its own determination about whether the person sitting in front of Chick's store at the beginning of the video was the person who grappled with Gross later in the video. And several eyewitnesses who were familiar with Crump—including Gross, who

---

is standing right in front of the planter box who put his jacket up like this (indicating) and put the hat on is the same person.").

[34] *See* DEL. R. EVID. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

had known Crump for several years—identified Crump as the assailant.[35] We find no plain error with respect to Chick's testimony.

*Increased Security During Closing Arguments*

(25) Crump's fifth claim of error is that he was prejudiced by the Superior Court's decision to allow additional security measures in the courtroom during the final day of trial. The presentation of evidence at trial had been completed on February 6, 2018. Only the presentation of closing arguments and jury instructions remained to be completed on the final day of trial. On February 7, Crump was not transported to court. In a courtroom conference, in which the prosecutor and Crump's standby counsel participated, a corrections officer reported that Crump had not been transported because he been involved in an altercation with another inmate overnight and then had been placed on suicide watch. When Crump was transported for the final day of trial on February 9, the Court granted the State's request that extra security measures be permitted. The extra security precautions included a requirement that Crump deliver his closing statement while standing at counsel table, instead of at the podium, and enhanced officer coverage in the courtroom.

---

[35] *See Cooke v. State*, 97 A.3d 513, 546-47 (Del. 2014) (detective's testimony that voice on 911 call belonged to defendant was lay opinion testimony, but its admission was harmless because the jury heard the recordings of the calls, watched a videotape of the defendant's post-arrest interview, and heard the defendant speak in court, and because defendant's girlfriend testified that she was certain that the voice on the 911 call was defendant's).

(26)    The United States Supreme Court has held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."[36]  In this case, we cannot conclude that the extra precautions presented a scene to the jurors that was "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial," and Crump has failed to show actual prejudice.[37]  We therefore find no plain error.

*Cumulative Error*

(27)    Finally, Crump claims that the alleged errors cumulatively resulted in an unfair trial.  When there are multiple errors in a trial, this Court weighs their cumulative effect to determine if, combined, they are "prejudicial to substantial rights so as to jeopardize the fairness and integrity of the trial process."[38]  Because all of Crump's assignments of error are without merit, his claim of cumulative error also fails.[39]

---

[36] *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).

[37] *See id.* at 572 (finding no prejudice from the presence of four additional armed guards seated in the front row of the courtroom during trial of six defendants).

[38] *Johnson v. State*, 2015 WL 8528889, at *3 (Del. Dec. 10, 2015) (internal quotations and modification omitted).

[39] *Id.*

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.


BY THE COURT:


*/s/ Karen L. Valihura*
Justice