IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFREY PHILLIPS, | § | |
| | § | No. 511, 2015 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1210013272 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: November 2, 2016
Decided: January 17, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Kevin J. O'Connell, Esquire (*Argued*), Bernard J. O'Donnell, Esquire, Misty A. Seemans, Esquire, Office of Public Defender, Wilmington, Delaware, Attorneys for Defendant Below, Appellant.

Sean P. Lugg, Esquire (*Argued*), Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware.

**HOLLAND**, Justice; for the Majority:

This is a direct appeal from a final judgment of convictions in the Superior Court. A grand jury issued a 54 count indictment charging the defendant below Appellant, Jeffrey Phillips ("Jeffrey"), Otis Phillips ("Otis"), and fourteen other co-defendants with gang participation charges relating to criminal activities of the Sure Shots street gang (the "Sure Shots"). Jeffrey was charged with two counts of Murder in the First Degree, Attempted Murder in the First Degree, Gang Participation, Conspiracy in the First Degree, Reckless Endangering in the First Degree, Four Counts of Possession of a Firearm During the Commission of a Felony, Riot, Conspiracy in the Second Degree, Disorderly Conduct, Two Counts of Assault in the Third Degree, and Criminal Mischief. The State sought the death penalty for Jeffrey.

The Superior Court denied severance motions and, instead, conducted a joint capital trial of Jeffrey and Otis that began on October 20, 2014 and lasted 21 days. On November 21, 2014, the jury convicted Jeffrey of Murder in the First Degree, Manslaughter (as a lesser-included offense), Gang Participation, Conspiracy in the First Degree, Four Counts of Possession of a Firearm During the Commission of a Felony, Assault in the Second Degree, Reckless Endangering in the First Degree, and Disorderly Conduct (as a lesser-included offense). The jury acquitted Jeffrey of Assault in the Third Degree and Conspiracy in the Second Degree.

2

The penalty hearing began on December 18, 2014, and the jury found "'two in the affirmative, 10 in the negative' on the question of whether the aggravating circumstances outweighed the mitigating circumstances." The State withdrew its intent to seek the death penalty on September 4, 2015, and the Superior Court sentenced him to life imprisonment and an additional 72 years in prison, followed by decreasing levels of supervision, for the remaining convictions.

Jeffrey raises five issues on appeal. First, Jeffrey challenges the Superior Court's refusal to grant a mistrial on the basis of prosecutorial misconduct and prejudicial testimony. Second, Jeffrey claims that the Superior Court denied him the right to effectively prepare for trial by granting the State's protective orders. Third, Jeffrey contends that the Superior Court erred in refusing to grant severance from a joint trial with Otis and from joining the Gang Participation and Riot charges with the homicide charges. Fourth, Jeffrey argues there was insufficient evidence for a reasonable jury to convict him of Gang Participation. Finally, Jeffrey claims that the Superior Court's deficient jury instructions require reversal.

We have determined that all of Jeffrey's arguments are without merit. Therefore, the judgment of the Superior Court must be affirmed.

### Facts

On January 27, 2008, Christopher Palmer was shot and killed inside an after-hours nightclub in Wilmington, Delaware. Herman Curry witnessed the murder.

More than four years later, on July 8, 2012, Curry and Alexander Kamara were shot and killed during a soccer tournament at Eden Park in Wilmington, Delaware. Wilmington Police Department ("WPD") officers investigated the 2008 and 2012 murders. The investigations revealed that the suspects in the homicides, Otis and Jeffrey, were members of a gang known as the "Sure Shots."

*Christopher Palmer Murder.* There was a birthday party for Curry on January 27, 2008 at a nightclub on Locust Street in Wilmington. Palmer, the security guard responsible for checking guests for weapons prior to entry, denied three individuals—believed to be Otis, Jovani Luna, and Dwayne Kelly—entry into the club because "one or more of them was armed." A bystander, Clayon Green, witnessed the trio of men return and saw one of them push Palmer after he was again denied entry. According to Green, "Palmer and his assailant fell into a nearby bathroom, Otis 'reached around' into the bathroom and Green heard three shots." Palmer died as a result of the gunshot wounds. Curry also witnessed the incident and identified Otis as Palmer's shooter in a photo lineup. Afterwards, Kelly told Paula Thompson—his girlfriend at the time—that he and Otis were going to New York and Kelly did not see Otis after that visit.

*Nightclub Incident.* Four years later, on July 7, 2012, Jeffrey was involved in another shooting at a nightclub. According to the State, Kelmar Allen's testimony established that Allen removed Jeffrey from the club after Jeffrey got into an

4

altercation with a rival gang member. As Allen and Kirt Williams waited for an elevator, Christopher Spence shot at them, "killing Williams and wounding Allen." After running outside, Allen "saw Jeffrey firing a .40 caliber gun at a person named 'Mighty,'" a rival gang member. The next day, Allen saw Jeffrey at a house on Lamotte Street, where he and other Sure Shots members were "collecting guns and bullets in the basement of the home." According to Allen, the members were angry because they wanted to find the rival gang members from the night before. The Sure Shots leader, Seon Phillips ("Seon", Otis's brother, no relation to Jeffrey), loaded a .40 caliber gun and gave it to Jeffrey.

*Eden Park Murder.* On July 8, 2012, Curry organized an annual soccer tournament at Eden Park in Wilmington, Delaware. While Ricardo Brown was preparing food at the outdoor kitchen with Curry, he noticed two men walk through a gate onto the soccer field. Shortly after that, he heard "fire rockets go off" and "turned and saw one of the men shoot Curry while the other shot his gun 'wild[ly].'" Curry and Kamara died as a result of their gunshot wounds (the "Eden Park Homicides").

There were other witnesses to the homicides. Nearby soccer player, Raoul Lacaille saw two men approach Curry, tap him on the shoulder, and shoot him, identifying Otis as Curry's shooter. Omar Bromfield also heard what he described as firecrackers, saw a crowd running through the parking lot, and discovered shortly

5

after that he had been shot. Venus Cherry, a tournament participant, saw two men enter the field, approach Curry, tap him on the shoulder, and one said, "Ninja, run, pussy, today you are dead," prior to shooting him. According to Cherry, "[t]he second man turned toward the 'kitchen' area and fired his gun; a bullet hit Kamara and Cherry." Cherry identified Otis as Curry's shooter and Jeffrey as Kamara's shooter.

Green witnessed Otis and Jeffrey walk across the field and then "saw Otis shoot at Curry, and Jeffrey shoot toward the parking lot as if to clear the way." Green then saw Otis and Jeffrey return to a gold car, and saw Christopher Spence approach the car and shoot the driver, Serge. Minutes after the shooting, officers found the gold car crashed at a nearby intersection. Officer Corey Staats found a handgun on the rear seat, "and observed the semi-conscious driver bleeding from his torso." Upon searching the vehicle, police discovered a 9 mm handgun, .40 caliber handgun, and black baseball cap containing DNA that matched that of Otis. According to firearm examiner Carol Rone, the shell casings collected from the Eden Park crime scene were fired from the recovered firearms.

Officers searched the surrounding area for the two men who had fled from the crashed gold car and located Otis and Jeffrey in a back yard approximately four blocks north of Eden Park. A brief standoff followed, and then the officers arrested

6

Otis and Jeffrey. The police noticed Jeffrey was wounded from a gunshot in the leg and discovered 20 rounds of 9 mm ammunition in his pants pocket.

The State's primary witness against Jeffrey was Allen. During his direct testimony, Allen asserted that Jeffrey was a member of the Sure Shots, had received a loaded .40 caliber semi-automatic handgun from the leader of the Sure Shots, Seon, just prior to going to Eden Park on July 8, 2012, and was a willing participant in the shootout that took place in Eden Park on July 8, 2012. Prior to trial, Allen had pleaded guilty to Gang Participation. The sentence imposed by the trial judge was a period of incarceration suspended for time served (119 days) followed by level III probation.

***Gang Participation.*** The Sure Shots originated in Delaware in 1995 and was involved primarily in illegal drug trafficking. Sure Shots members had a reputation of carrying and using their firearms and engaging in various assaults, shootings, and homicides. The State alleges that Otis and Jeffrey were members of the Sure Shots. This allegation is predicated upon the WPD's investigation into the Palmer murder, the nightclub incident, and the Eden Park Homicides, as well as an altercation at a Royal Farms (the "Royal Farms Incident").

On February 26, 2012, Shanice Kellam, her brother, Jeremy Showell, and three other friends went to a Royal Farms store in Bridgeville, Delaware. As they entered the store, Kellam heard a man say "[y]ou're a bad bitch," to which Showell

7

responded, "she's not a bitch, she's a lady." A group of men approached them and one punched Kellam in the face. The men then attacked Kellam and Showell. A second carload of men arrived at the Royal Farms and joined the first group in their attack of Kellam and Showell. The altercation was captured on video and Detective Curley identified Jeffrey and other members of the Sure Shots gang as Kellam's and Showell's assailants. The WPD homicide investigations and the Royal Farms Incident constituted the predicate offenses for the Gang Participation charge against Jeffrey.

### *Mistrial Properly Denied*

On the second day of trial, October 21, 2014, the State informed defense counsel that Maria DuBois had entered into a witness protection agreement with the State. Defense counsel immediately requested that the trial judge require the State to identify any other witnesses that had entered into witness protection agreements with the State, as well as an accounting of the financial benefits that they had received pursuant to those agreements. Over the next several days, the State provided defense counsel with the witness protection agreements of four co-defendants and an accounting of the financial benefits paid to or on behalf of those State witnesses. Three of these witnesses testified.

The witness protection agreements were written documents that provided financial benefits in exchange for the witnesses' cooperation in the prosecution of

8

various Sure Shots defendants, including Jeffrey. The agreements required the witnesses "to testify truthfully if called as a witness" at trial. The agreements gave the Chief Deputy Attorney General of the Department of Justice "the sole authority to finally determine whether a material breach of this agreement by . . . the witness [had] occurred and the appropriate remedies and sanctions."

The trial judge recognized that the witness protection agreement evidence had the potential to cause confusion. These agreements implied that the witness was in danger from any or all of the co-defendants in the case to such an extent that the State was willing to expend thousands of dollars to protect the witness. Conversely, the fact that the witnesses were receiving financial benefits as a result of their decision to testify against defendants had the potential to demonstrate bias.

Prior to the testimony of Maria DuBois, the trial judge ruled that the State could not ask any witness about a witness protection agreement during direct examination but the defense could cross-examine the witness about the financial benefits received as a result of being in witness protection. The trial judge advised the State to discuss this issue with their witnesses in advance of testifying, and that if the State raised the issue in its case-in-chief they did so at their "own peril." Defense counsel for Jeffrey did not raise the issue of witness protection during the cross-examination of Maria DuBois or Michael Young, because neither of those witnesses testified in a manner that inculpated Jeffrey.

Allen was called as a State witness on October 24, 2014. After a few foundational questions, the State placed Allen's plea agreement in front of him and asked him the following question:

> Q: Now, without again looking at the document, what, if any, benefits did the State promise you in exchange for your plea?
> A: Just that, just that, like, witness protection.

All of the attorneys immediately went to sidebar where the State informed the trial judge: "I've instructed this witness multiple times that I was not allowed to ask about witness protection . . . [s]o I don't know why he mentioned that." Defense counsel for Jeffrey initially asked for a curative instruction but then requested a mistrial.

The trial judge denied the motion for mistrial and then permitted defense counsel to examine Allen outside the presence of the jury. During that examination, Allen revealed that he was in witness protection as a result of his fear of "everything that is going on", but not as a result of threats made by Jeffrey. With regard to what the State had told Allen to say about witness protection, the following exchange occurred upon questioning by counsel for Jeffrey:

> Q: Mr. Allen, the prosecutors met with you before you testified, correct?
> A: Yeah.
> Q: And they instructed you not to talk about the witness protection, correct?
> A: No, they didn't tell me not to talk about a witness protection—they didn't instruct me to talk about a witness protection.
> Q: Not to talk about it?

10

A:    No. I said they didn't instruct me. They just told me to tell the truth.

Q:    There's never any discussion with you and the prosecutors about talking—not talking about witness protection?

A:    No.

The State then asked Allen questions concerning prior discussions with him about witness protection:

Q:    Did the State, did I today explain to you about witness protection?

A:    Yes.

Q:    Do you recall, do you recall me telling you that I wasn't going to ask you about witness protection?

A:    Yes.

Q:    Did I explain to you that defense counsel would then ask you about witness protection?

A:    Yes.

Q:    Then did I explain to you that I would then be able to stand up and ask you more?

A:    After more, yeah.

Q:    So what was your understanding with what I would ask you about witness protection?

A:    Can you repeat that question to me?

Q:    Yeah. What did you understand me saying when I said I wasn't going to ask you about witness protection and that only they could?

A:    I didn't even really understand that.

Defense counsel for Jeffrey renewed his motion for a mistrial, emphasizing that the State had not made it clear to its witness that evidence concerning witness protection was not to be discussed unless specifically asked by the defense. Both defendants also argued that a curative instruction was insufficient. The trial judge denied the renewed motions for a mistrial.

Defense counsel for Jeffrey then informed the trial judge of their intent to explore the issue of payments made to Allen pursuant to the witness protection agreement. Defense counsel for Otis objected to action by Jeffrey. Both defendants then moved for a severance and a mistrial. Those motions were denied.

The Superior Court concluded that "Allen merely stated that his participation in witness protection was a benefit that he received under his plea agreement with the State," and that Allen's improper mention of his participation in witness protection was not the result of prosecutorial misconduct and "did not sufficiently prejudice either of the Defendants to warrant a mistrial." Instead, a previously prepared limiting instruction was given to the jury as follows:

> Ladies and gentlemen, the witness has testified that he currently has some involvement in the Witness Protection Program. There's no evidence before you that the defendants personally made any threats, directly or indirectly, against the witness. The fact that a witness received a benefit in the program may only be considered by you for the purpose of judging the credibility of the witness, it should not be considered by you in determining the guilt of the defendants.

Jeffrey argues that the Superior Court abused its discretion when it denied his motions for a mistrial. According to Jeffrey, the State failed to disclose exculpatory *Brady*[1] material, which led to the introduction of prejudicial evidence—namely, the testimony from Allen concerning the witness protection agreement. In *Pena v.*

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

*State*,[2] this Court established a four-factor assessment to determine whether a mistrial should be granted in response to an allegedly prejudicial remark by a witness: (1) the nature and frequency of the offending comment; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the adequacy of the trial judge's actions to mitigate any potential prejudice.[3] In *Revel v. State*,[4] the Court added that a mistrial should only be granted as a last resort when there are no other alternatives—i.e., where there is "'manifest necessity' or the 'ends of public justice would otherwise be defeated.'"[5] Moreover, regarding the fourth factor, a trial judge's prompt curative instructions "are presumed to cure error and adequately direct the jury to disregard improper statements."[6] And "[j]uries are presumed to follow the trial judge's instructions."[7]

We will apply the four *Pena* factors in this case. First, Allen only testified on one occasion that he was in witness protection. Second, Allen gave no testimony before the jury that he had a particularized fear of Jeffrey or Otis. Third, this was not a close case. Several witnesses testified to Jeffrey's involvement in the Curry and Kamara homicides and his general involvement in the Sure Shots gang. Fourth, while the jury may have speculated that Allen's participation in witness protection

---

[2] 856 A.2d 548 (Del. 2004).
[3] *Id.* at 550.
[4] 956 A.2d 23 (Del. 2008).
[5] *Id.* at 27 (quoting *Brown v. State*, 897 A.2d 748, 752 (Del 2006)).
[6] *Id.* (quoting *Pena*, 856 A.2d at 551).
[7] *Id.*

13

was directly attributable to Jeffrey or Otis, the trial judge's curative instruction addressed such speculation.

Consideration of the four *Pena* factors establishes that the trial judge acted within his discretion in denying Jeffrey's motion for a mistrial. The trial judge was in the best position to assess the potential prejudice of Allen's statement and his decision to deny Jeffrey's motion for a mistrial was neither arbitrary nor capricious. To the extent the terms and conditions of Allen's participation in a witness protection program were *Brady* material, Jeffrey received the information sufficiently in advance of Allen's testimony to use it effectively. To the extent that Allen's comment to the jury that he received witness protection for his plea prejudiced Jeffrey, that prejudice was effectively ameliorated by the trial judge's limiting instruction.

### *Protective Orders Proper*

Jeffrey challenges two pre-trial protective orders that restricted his defense counsel's ability to share the identity of co-defendants and witnesses with him, along with others and the content of their statements. This Court reviews "a trial judge's application of the Superior Court Rules relating to discovery"—such as the protective orders at issue here—"for an abuse of discretion."[8]

---

[8] *Hopkins v. State*, 893 A.2d 922, 927 n.5 (Del. 2006).

14

On April 16, 2014, upon *ex parte* application by the State, the trial judge entered a protective order pursuant to Superior Court Criminal Rule 16(d). That order prohibited counsel for each defendant from sharing with their clients, the friends, family, and associates of their clients, or with counsel's employees or agents, the identification of the cooperating co-defendants who had given statements as well as the contents of those statements. On August 14, 2014, upon application by the State, the trial judge entered another protective order that prohibited counsel for the defendants from disclosing the identity of the witnesses whose statements were to be provided to counsel on August 15, 2014. The protective order also prohibited defense counsel from sharing with their client, the friends, family, and associates of their clients, or any employee of defense counsel, the contents of statements made by these witnesses. After the protective orders were entered, the State provided Jeffrey's attorney with over 1,100 pages of transcribed statements from 49 witnesses.

Jeffrey acknowledges that, upon his request, he was provided some relief from the protective orders. First, prior to trial, Jeffrey's counsel was permitted to "share the protected statements with their staff, but not with investigators." Second, "[t]he State agreed to the Superior Court granting complete relief from the protective orders following jury selection but before the beginning of trial." Jury selection concluded on October 9, 2014, and the jury was sworn and trial began on October 20, 2014.

15

Prior to any witness testifying, Jeffrey and his counsel possessed, and had the opportunity to discuss, every witness statement. Accordingly, Jeffrey does not argue that he was not provided access to statements. Instead, his challenge focuses on the timing full access was granted. But, once full access was provided, he did not seek additional time for review.

Pursuant to Rule 16, the State is required to disclose statements of the defendant or a co-defendant, the defendant's prior criminal record, investigative documents and tangible objects, reports of examinations and tests, and expert witness evidence. "Rule 16 does not require the State to disclose the identity of its witnesses prior to trial or to provide a 'complete and detailed accounting . . . of all police investigatory work on a case.'"[9] The State has a duty to disclose exculpatory evidence; "[t]his duty, however, does not extend to the disclosure of material that is non-exculpatory."[10]

Jeffrey's reliance on *Roviaro v. United States*[11] is misplaced. In *Roviaro*, the prosecution withheld the identity of an undercover informer who was the "sole participant, other than the accused, in the transaction charged."[12] Under these circumstances, the United States Supreme Court concluded that the trial court erred

---

[9] *Goode v. State*, 136 A.3d 303, 312 (Del. 2016) (quoting *Lovett v. State*, 516 A.2d 455, 472 (Del. 1986)).
[10] *Liket v. State*, 719 A.2d 935, 397 (Del. 1998).
[11] 353 U.S. 53 (1957).
[12] *Id.* at 64.

by allowing the prosecution to withhold the informer's identity.[13] In reaching this conclusion, though, the *Roviaro* Court declined to impose a "fixed rule" for disclosure.[14] Rather, the Court held that "[w]hether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."[15]

In Jeffrey's case, the witnesses' statements were disclosed well in advance of trial, their identities were revealed in advance of trial, and they were called to testify during trial, revealing their identities and the substance of their testimony, and subjecting them to cross-examination. The record reflects that the trial judge struck a proper balance between witness safety and Jeffrey's ability to prepare his defense.

### *Joinder of Defendants Proper*

Ordinarily, defendants indicted together should be tried together, but, if justice requires it, the trial judge should grant separate trials.[16] This Court set forth four factors that a trial court should consider when determining whether to sever defendants: "(1) problems involving a co-defendant's extra-judicial statements; (2) an absence of substantial independent competent evidence of the movant's guilt; (3)

---

[13] *Id.* at 65.
[14] *Id.* at 62.
[15] *Id.*
[16] *Skinner v. State*, 575 A.2d 1108, 1119 (Del. 1990); Super. Ct. Crim. R. 8(b).

17

antagonistic defenses as between the co-defendant and the movant; and (4) difficulty in segregating the State's evidence as between the co-defendant and the movant."[17]

This Court reviews the trial court's decision on a motion to sever for abuse of discretion.[18] A trial judge's denial of a motion to sever will not be set aside on appeal "unless [the] defendant demonstrates a 'reasonable probability' that the joint trial caused 'substantial injustice.'"[19]

During trial, after Allen testified to his participation in the witness protection program, Jeffrey moved to sever his case from Otis's. Jeffrey argued that severance was required because he and his co-defendant sought to engage in different cross-examination strategies to address the witness protection issue. The Superior Court denied Jeffrey's motion, finding:

> In this case, both the Defendants argue that one defendant's decision to cross-examine the State's witness regarding their participation in witness protection would prejudice the other defendant, whose trial strategy was to not address witness protection. However, neither of the Defendants' positions present separate defenses as to a State's witness's participation in witness protection, or otherwise, that the jury could only reasonably accept the core of if it rejects the core of the defense offered by his co-defendant. Moreover, neither of the Defendants testified or presented evidence that directly implicated the other in their own defense.

---

[17] *Floudiotis v. State*, 726 A.2d 1196, 1210 (Del. 1999).
[18] *Winer v. State*, 950 A.2d 642, 648 (Del. 2008).
[19] *Id.* (alteration in original) (quoting *Walker v. State*, 790 A.2d 477, 2002 WL 122643, at *1 (Del. Jan. 24, 2002) (TABLE)).

18

Jeffrey argues that the differences between his and Otis's cross-examination strategies for Allen created antagonistic defenses that compelled severance.

"[T]he presence of hostility between a defendant and his codefendant or 'mere inconsistencies in defenses or trial strategies' do not require a severance."[20] Jeffrey wanted to explore Allen's witness protection agreement on cross-examination. Otis did not want to address Allen's participation in the witness protection program. Their differing positions on cross-examination did not create a situation in which they were presenting separate defenses that required "the jury [to] reasonably accept the core of the defense offered by either defendant only if it reject[ed] the core of the defense offered by his codefendant."[21]

However, Jeffrey does not base his argument solely on inconsistent strategies. He also points to general prejudice caused by his association with Otis and Otis's attorney's accusatory statements in closing arguments. According to Jeffrey, there was a potential for prejudice and even confusion considering Otis faced charges for crimes that occurred before Jeffrey even came to the United States from Jamaica, including a charge for the murder of Palmer. Jeffrey argues that "the jury could have had difficulty in segregating the evidence against each defendant," because no evidence was presented suggesting Jeffrey's involvement in the Palmer murder. In

[20] *Outten v. State*, 650 A.2d 1291, 1298 (Del. 1994).
[21] *Bradley v. State*, 559 A.2d 1234, 1241 (Del. 1989).

19

other words, there was a danger that the jury would not be able to segregate the evidence of Otis's separately charged crimes from the Eden Park Homicides. Jeffrey also points out that, in closing remarks, Otis's defense counsel implicated Jeffrey several times, noting that the evidence showed that Jeffrey was present at the gunfight at the nightclub when Otis was not, that he was present at Lamotte Street when Otis was not, and that he was present at Eden Park when Otis was not.

The trial judge instructed the jury to "weigh the evidence and apply the law individually to render separate verdicts as to each defendant." Juries are presumed to follow the court's instructions. The record reflects that Jeffrey's association with Otis and the closing remarks by Otis's attorney are the incidental type of prejudice that is expected with joint defendants and not the substantial injustice required to find severance is necessary on abuse of discretion review. Jeffrey has failed to demonstrate a "reasonable probability that substantial prejudice may result from a joint trial."[22] The Superior Court did not abuse its discretion when it denied Jeffrey's motion to sever the defendants' trials.

### *Joinder of Offenses Proper*

Prejudice from joinder of offenses may arise in the following three situations:

> [F]irst, when the jury might cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; second, when the jury might use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find

---

[22] *Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990).

20

guilt of the other crime or crimes; and, third, when the defendant might be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[23]

"The defendant has the burden of demonstrating such prejudice and mere hypothetical prejudice is not sufficient."[24]

Prior to trial, Jeffrey moved to sever the charges relating to the Eden Park Homicides from the gang participation-related charges. The trial judge denied Jeffrey's motion. Jeffrey argues that the Gang Participation and Riot charges were not of the same or similar character as the charges resulting from the Eden Park Homicides and that they were not connected. He contends that evidence of the Gang Participation and Riot charges would not have been admissible in a separate trial for the charges relating to the Eden Park Homicides. This Court previously considered and rejected a similar argument in *Taylor v. State*.[25]

In *Taylor*, Kevin Rasin, Taylor's co-defendant, argued that "the inclusion of the Gang Participation charge at his trial for Murder, Attempted Murder, and additional felonies was unfairly prejudicial to him because it allowed the State to proffer evidence that portrayed Rasin as a frequent drug dealer."[26] Rasin claimed that "without the Gang Participation charge, the State would not have been able to

---

[23] *Ashley v. State*, 85 A.3d 81, 84–85 (Del. 2014).
[24] *Skinner*, 575 A.2d at 1118.
[25] 76 A.3d 791 (Del. 2013).
[26] *Id.* at 800–01.

admit prior bad acts evidence during its case-in-chief."[27] The Court rejected Rasin's argument, stating:

> Rasin's argument is premised on the assumption that evidence of his drug dealing would not have been admissible at a separate trial for the First Degree Murder Charge and his two Attempted First Degree Murder charges. That is not a sound premise. The State presented witnesses who portrayed Rasin as a frequent drug dealer between 2008 to 2010, and introduced his prior drug convictions during its case-in-chief. This evidence was relevant to prove the existence of a gang, as well as Rasin's knowing promotion of the TrapStars' criminal purpose. This same evidence also would have been admissible in a separate trial of Rasin's Murder, Attempted Murder, and additional felony charges. Gang motivation and retaliation would have been an important part of the State's case-in-chief to prove Rasin's motive to commit those violent crimes. Otherwise, the crimes would have seemed like random acts of violence. In sum, the evidence supporting the charges in the indictment was "inextricably intertwined" and, therefore, admissible. Because the evidence would have been admitted even if the charges were severed, the trial court acted well within its discretion in denying severance.[28]

The State presented evidence that Jeffrey was part of the Sure Shots gang and that he and others engaged in violent acts as members of the gang. Retaliatory action for violence inflicted upon fellow gang members was part and parcel of the State's case as it related to the Eden Park Homicides. The evening prior to the Eden Park Homicides, Sure Shots gang members, including Jeffrey, participated in an altercation at a nightclub that resulted in two people being shot; one of the two, Allen, was a fellow Sure Shots member. The State presented evidence that

---

[27] *Id.* at 801.
[28] *Id.*

retaliation for the nightclub shooting was the motive behind the Eden Park Homicides. This evidence established the existence of the gang and the motive for the Eden Park Homicides. As in *Taylor*, "the evidence supporting the charges in the indictment [against Jeffrey] was 'inextricably intertwined' and, therefore, admissible."[29]

The record does not reflect that the jury either cumulated evidence among the counts or inferred a criminal disposition to find Jeffrey guilty. The trial judge instructed the jury that the evidence of each offense was to be considered separately. The jury's verdict demonstrates that they adhered to the court's instruction, finding Jeffrey guilty of Manslaughter (as a lesser-included offense of Murder First Degree for Kamara), Disorderly Conduct (as a lesser-included offense of Riot), and acquitting him of Assault Third Degree and Conspiracy Second Degree. The jury was able to distinguish the offenses and segregate the evidence. Consequently, Jeffrey cannot establish a reasonable probability of substantial prejudice.[30] The trial court did not abuse its discretion in denying his motion to sever the charges.

### Gang Participation Evidence

This Court reviews a sufficiency of the evidence claim *de novo*.[31] This review requires the Court to determine "whether any rational trier of fact, viewing the

---

[29] *Id.*
[30] *See Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990).
[31] *Farmer v. State*, 844 A.2d 297, 300 (Del. 2004).

evidence in the light most favorable to the State, could find [a] defendant guilty beyond a reasonable doubt."[32]

Title 11, Section 616(b) of the Delaware Code provides that an individual is guilty of illegal Gang Participation if he or she "actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and who knowingly promotes, furthers, or assists in any criminal conduct by members of that gang which would constitute a felony under Delaware law."[33]   Thus, the statute contains three essential elements: active participation in a criminal street gang; knowledge that the gang's members engage in or have engaged in a pattern of criminal conduct; and knowing promotion, furtherance, or assistance in felonious conduct.

A plain reading of the statute does not require the defendant to commit the predicate offenses himself.  Therefore, the issue is whether a reasonable juror could find that Jeffrey participated in the Sure Shots knowing it was engaged in a pattern of criminal gang activity and that he "knowingly promote[d], further[ed], or assist[ed] in any criminal conduct by members of that gang which would constitute a felony under Delaware law."[34]  The State argues that there was sufficient evidence

---

[32] *Id.* (quotation marks omitted) (quoting *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995)).

[33] 11 *Del. C.* § 616(b).  The statute defines "pattern of criminal gang activity" as "the commission of attempted commission of, conspiracy to commit, solicitation of, or conviction *of 2 or more* of the following criminal offenses . . . ." (emphasis added).  The statute goes on to list the applicable offenses and also provides that the offenses must have occurred within 3 years of each other.

[34] 11 *Del. C.* § 616(b).

supporting the jury's conviction of Jeffrey on the Gang Participation charge. In support of this contention, the State points to Allen's testimony, which established Jeffrey's awareness and participation in the gang's criminal activity. Allen testified that Jeffrey "[took] care of business" for the gang's leader; that Jeffrey committed a predicate act when he was convicted of disorderly conduct relating to the assault and harassment of Kellam and Showell; that the jury's conviction of Jeffrey for the murder of Curry was a predicate act supporting the Gang Participation charge in addition to a conviction of Manslaughter for Karama, and Attempted Murder in the First Degree of Bromfield; and that he had been identified as a member of the Sure Shots. The record reflects that, based on this evidence, a reasonable jury could have concluded that Jeffrey's conduct was more than just passive association with the Sure Shots.

### Jury Instructions

Jeffrey argues that the Superior Court erred in its instructions to the jury on the Gang Participation charge. According to Jeffrey, the jury instructions did not properly state the mens rea requirements of the offense. This Court reviews the trial court's denial of a requested jury instruction *de novo*.[35] The Court will not reverse the trial court's jury instruction "if it is 'reasonably informative and not misleading,

---

[35] *Floray v. State*, 720 A.2d 1132, 1138 (Del. 1998).

judged by common practices and standards of verbal communication.'"[36] The Court will reverse, however, "if the alleged deficiency in the jury instructions 'undermined . . . the jury's ability to intelligently perform its duty in returning a verdict.'"[37]

The State concedes that the trial judge gave an incorrect mens rea instruction. Rather than instructing on the statute's use of *knowingly*, the trial judge provided instructions on *intentional* as follows: "The Defendant's participation in the ongoing organizations, associations, or group of three or more persons, whether formal or informal was intentional; that is, it was his conscious object or purpose to engage in a 'criminal street gang,' as that term has been defined for you." Although this is a misstatement of law, in this case it constituted a harmless error.

The State cites *Flamer v. State*[38] for the proposition that "intentional is a higher state of mind" than knowingly. The Delaware Criminal Code's definitions of intentionally and knowingly support the State's contention. Section 231(b) defines "intentionally":

> A person acts intentionally with respect to an element of an offense when:
> (1) If the element involves the nature of the person's conduct or as a result thereof, it is *the person's conscious object* to engage in conduct of that nature or to cause that result and;

---

[36] *Id.* (quoting *Baker v. Reid*, 57 A.2d 103, 109 (Del. 1947)).
[37] *Flamer v. State*, 490 A.2d 104, 128 (Del. 1983) (quoting *Newman v. Swetland*, 338 A.2d 560, 562 (Del. 1975)).
[38] 490 A.2d 104 (Del. 1984).

26

(2) If the element involves the attendant circumstances, the person is aware of the existence of such circumstances or believes or hopes they exist.[39]

Knowingly is defined in 11 *Del. C.* § 231(c) as follows:

A person acts knowingly with respect to an element of an offense when: (1) If the element involves the nature of the person's conduct or the attendant circumstances, *the person is aware* that the conduct is of that nature or that such circumstances exist; and (2) If the element involves a result of the person's conduct, *the person is aware* that it is practically certain that the conduct will cause that result.[40]

Based on these definitions, "intentionally" does denote a higher mens rea standard as it requires the result of the conduct to be the person's "conscious object," rather than simply requiring the person be aware of the circumstances and resulting consequences. Although the instructions in Jeffrey's case contained a misstatement of the law, the error was harmless beyond a reasonable doubt. The instruction did not undermine the jury's ability to intelligently perform its duty or call the verdict into question because the jury found Jeffrey guilty on a higher, albeit incorrect, standard of mens rea.

### *Conclusion*

For the reasons set forth above, the judgment of convictions by the Superior Court is affirmed.

---

[39] 11 *Del. C.* § 231(b) (emphasis added).
[40] 11 *Del. C.* § 231(c) (emphasis added).

27

**STRINE**, Chief Justice, concurring:

I cannot join fully in the reasoning of my colleagues in the majority for one reason. The majority holds that the Superior Court did not abuse its discretion in denying a mistrial after the State's witness, Kelmar Allen, improperly testified to being in witness protection based on the conclusion that: Allen only testified on one occasion that he was in witness protection; Allen gave no testimony before the jury that he feared Jeffrey or Otis; the case was not close; and, even if the jury speculated that Allen's participation in witness protection was directly attributable to Jeffrey or Otis, the jury instruction cured any such prejudice. But, this is a case where the State argued that Otis and Jeffrey killed Herman Curry to eliminate him as an eyewitness to the 2008 murder of Christopher Palmer that Otis was wanted for.[1] Here, where the State's theory at trial was one of "[r]evenge, retaliation, and

---

[1] The State's first remarks during its opening statements set out this theory:

> Revenge, retaliation, elimination. Revenge for the murder of their friend Kirt Williams. Retaliation for the attack on the Sure Shots. And elimination of Herman Curry as an eyewitness to a 2008 murder Otis Phillips was wanted for. January 2007 – January 27th, 2008 started out as a birthday party for Herman Curry and ended in mayhem and murder, as Herman Curry watched Otis Phillips gun down his friend Christopher Palmer right before his eyes. It was Herman Curry who called 911 that night at that party. It was Herman Curry who told the police what happened to his friend Chris Palmer. It was Herman Curry who identified Otis Phillips as being responsible for that murder. Based on Herman Curry's statements, Otis Phillips was wanted for murder from that point on. . . . [F]ueled by revenge, retaliation and elimination, armed with guns and extra ammunition, Otis Phillips and Jeffrey Phillips walked into Eden Park, walked by dozens of people, walked right up to Herman Curry, tapped him on the shoulder, and as Herman Curry turned around, they executed him . . . .

Trial Tr., 21–22, Oct. 20, 2014.

1

elimination,"[2] the introduction of witness protection evidence created a high likelihood of prejudice which could not be cured by an instruction to the jury. But, because the evidence the State presented against Otis and Jeffrey was so overwhelming—and therefore this case was not at all close—I concur with the majority that the Superior Court did not abuse its discretion in denying a mistrial.

## I.

After the State disclosed that four of its witnesses had entered witness protection, the Superior Court instructed the State not to elicit testimony from these witnesses regarding their participation in the witness protection program.[3] The State then put Kelmar Allen on the stand and questioned him about his plea agreement and benefits he was receiving from the State. The following exchange took place:

> Q: I'm handing you now what's been marked as State's Exhibit 193. Take your time with that document, Kelmar, and let us know if you recognize it?
> A: Yes, ma'am.
> Q: What is that document?
> A: That's my plea agreement.
>
> \* \* \*
>
> Q: Now, *without again looking at the document*, what, if any, benefits did the State promise you in exchange for your plea?
> A: Just the, just the, like, witness protection.[4]

---

[2] *Id.*

[3] App. to State's Answering Br. at B72 (Excerpt of Witness Protection Sidebar, Oct. 21, 2014).

[4] *Id.* at B91 (Excerpt of Trial Test., Kelmar Allen, Oct. 24, 2014) (emphasis added).

Jeffrey and Otis immediately moved for a mistrial, arguing that Allen's testimony "irreparably damaged both Otis and Jeffrey Phillips' positions in this trial."[5] The Superior Court denied the motions for mistrial, finding that Allen's remark did not sufficiently prejudice Jeffrey or Otis because "Allen did not testify in front of the jury that his participation in witness protection was in any way a result of threats to him made by either defendant" and "a previously prepared and approved limiting instruction was immediately given to the jury."[6]

The majority properly looks to the four factor analysis outlined in *Pena v. State*[7] as the governing standard to determine whether the Superior Court abused its discretion when it denied Jeffrey's motion for a mistrial.[8] Under *Pena*, this Court should analyze: (1) the nature and frequency of the offending comment; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the adequacy of the trial judge's actions to mitigate any potential prejudice.[9]

But, in my view, neither the majority nor the trial judge has explained how a jury could ever unhear and unthink the reality that the State was paying for Allen's living expenses—including housing and food—so that he would testify against

---

[5] *Id.* at A140.
[6] *State v. Phillips*, 2015 WL 5332388, at *6 (Del. Super. Ct. Sept. 3, 2015).
[7] 856 A.2d 548 (Del. 2004).
[8] *Id.* at 550.
[9] *Id.*

3

Otis and Jeffrey.[10]  As Justice Jackson explained in *Krulewitch v. United States*,[11] "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction."[12]

Not only that, the curative instruction did not in any way give the jury a logical way to think about what it had just heard.  The trial judge told the jury:

> Ladies and gentlemen, the witness has testified that he currently has some involvement in the Witness Protection Program.  There's no evidence before you that the defendants personally made any threats, directly or indirectly, against the witness.  The fact that a witness received a benefit in the program may only be considered by you for the purpose of judging the credibility of the witness, it should not be considered by you in determining the guilt of the defendants.[13]

But, in all fairness, this is too insubstantial a basis to cause a reasonable juror to be able to put away what she had just heard.  A reasonable juror dealing with a case where the State's theory was that the Sure Shots were a dangerous gang willing to kill and intimidate those who witnessed their crimes—and that Otis and Jeffrey set out to kill Curry for just that reason[14]—would likely presume that the reason Allen was in witness protection was because of a fear that he would be the next witness targeted by the Sure Shots.  That presumption would be reasonable— it was in fact why Allen was in witness protection, as the State admitted at oral

---

[10] App. to Appellant's Opening Br. at A80 (July 2, 2014 Witness Protection Services Agreement).

[11] 336 U.S. 440 (1949).

[12] *Id.* at 453 (Jackson, J., concurring) (citation omitted).

[13] App. to Appellant's Opening Br. at A138 (Oct 24, 2014, Excerpt of Test. And Voir Dire Of Kelmar Allen).

[14] *See supra* note 1.

4

argument[15]—and the State and trial judge gave the jury no reason to think there was any other basis for Allen to be in witness protection.

Furthermore, telling the jury to consider the fact that Allen was in witness protection only for the purpose of judging his credibility has no real utility because that fact was too important in the context of this case for the jury to disregard it on mere instructions. I fear this instruction asks more of jurors than we can honestly do as judges.

And, telling the jury to consider the fact that Allen was being protected by the State only for credibility purposes does not help cure any prejudice because a reasonable juror could actually give Allen's testimony *more* credence on the ground that he was some sort of hero for being willing to risk his life and limbs by testifying against Jeffrey and Otis.

At best, any affirmance of the Superior Court's decision to deny a mistrial can rest solely on the fact that this was not a close case—a *Pena* factor that basically creates a harmless error safety valve. There were numerous witnesses to the Eden Park shooting, and the events leading up to it, who testified at trial and implicated Jeffrey. Allen—a Sure Shots member—testified that Jeffrey and several other Sure Shots members were at a nightclub the night before the Eden

---

[15] Oral Arg. at 36:00, *Phillips v. State*, No. 511, 2015 (Del. Nov. 2, 2016). Allen also admitted during voir dire that he had been threatened by a Sure Shots member and that he was in witness protection due to his fear of being killed over his participation in this case. App. to Appellant's Opening Br. at A139 (Oct. 24, 2014 Excerpt of Test. And Voir Dire Of Kelmar Allen).

Park shooting. Jeffrey was involved in an altercation with a rival gang, and Kirt Williams, a member of the Sure Shots, was shot and killed. The next morning, Allen saw Jeffrey at a house on Lamotte Street with other Sure Shots members where they were collecting guns and loading them with bullets. Seon Phillips—the leader of the Sure Shots—loaded a .40 caliber gun and gave it to Jeffrey. According to Allen, the Sure Shots were angry and they wanted to find the rival gang members from the night before.

In addition to Sure Shots witnesses, there were numerous witnesses not affiliated with the Sure Shots who were present at Eden Park and saw Jeffrey and Otis arrive together and shoot Curry and Kamara. Ricardo Brown, who was at Eden Park for the soccer tournament, saw Jeffrey and Otis arrive and testified that he "heard fire rockets go off. And when [he] turned around, [he] saw the two guys . . . shooting their gun. One of them was shooting at Curry . . . [the other] was just shooting wild, just firing wild."[16] Venus Cherry, who was also at Eden Park for the soccer tournament, saw Otis and Jeffrey enter the park together, and he identified Otis as Curry's shooter and Jeffrey as Kamara's shooter. Clayon Green, another tournament participant, was in the parking lot when the shooting occurred. He testified that Otis and Jeffrey came out of a gold car and he saw them walk across the field. He then saw Otis shoot at Curry and Jeffrey "shooting wildly over

---

[16] App. to State's Answering Br. at B133 (Excerpt of Trial test., Ricardo Brown, Oct. 27, 2014).

in the field."[17] Green stated that he was "a hundred percent sure" that he saw Otis and Jeffrey.[18] After the shooting, Green saw Otis and Jeffrey run towards the gold car, and he saw Jeffrey get into the back seat.

Minutes later, the police discovered the gold car crashed at an intersection. Inside the car, police discovered a 9 mm handgun, a .40 caliber handgun, and a baseball cap containing DNA from Otis. Police officers searched the surrounding area and found Otis and Jeffrey *together* in a back yard. They discovered 20 rounds of 9 mm ammunition in Jeffrey's pants pocket and Jeffrey told them that he had a gunshot wound in his leg. The firearm examiner determined that the shell casings recovered from Eden Park were fired from the weapons found in the gold car.

Based on this overwhelming evidence, there was no rational dispute in the record that Jeffrey and Otis arrived together, Otis shot Curry and Jeffrey shot Kamara, and they fled together. Thus, this was not a close case for purposes of the *Pena* analysis.[19]

Furthermore, the jury verdict demonstrates how carefully the jury considered the evidence when it convicted Jeffrey, which provides even more support for

---

[17] *Id.* at B136 (Excerpt of Trial test., Clayon Green, Nov. 5, 2014).
[18] Trial Tr., 25–26, Nov. 5, 2014.
[19] *See e.g., Payne v. State*, 2015 WL 1469061, at *4 (Del. Mar. 30, 2015) (finding a case was not close under *Pena* when three witnesses identified the defendant as the person who committed the crime and "the State put forth substantial circumstantial evidence suggesting Payne was guilty").

upholding the Superior Court's decision. The jury convicted Jeffrey of Murder in the First Degree (for Curry), Manslaughter (as a lesser-included offense of Murder in the First Degree for Kamara), Gang Participation, Conspiracy in the First Degree, four counts of Possession of a Firearm During the Commission of a Felony, Assault in the Second Degree, Reckless Endangering in the First Degree, and Disorderly Conduct (as a lesser-included offense of Riot). The jury acquitted Jeffrey of Assault in the Third Degree and Conspiracy in the Second Degree.

This verdict demonstrates that the jury was able to distinguish between the evidence presented for the various charges and properly apply the law. For example, Jeffrey was charged with Murder in the First Degree for the killing of Kamara. At trial, Jeffrey's counsel argued that Jeffrey "wasn't aiming at anyone. He wasn't targeting anyone. We have the best example of intent. This is an example of criminally negligent or reckless behavior."[20] Indeed, the witnesses who testified at trial stated that Jeffrey was shooting "wildly."[21] Instead of convicting Jeffrey of Murder in the First Degree or Murder in the Second Degree, the jury convicted Jeffrey of Manslaughter for the killing of Kamara. The jury instructions accurately stated that, in order to find Jeffrey guilty of Manslaughter, the jury must find that he acted recklessly, which means he "was aware of and consciously disregarded a substantial and unjustifiable risk that death would result

---

[20] Trial. Tr., 35, Nov. 19, 2014.
[21] App. to State's Answering Br. at B136 (Excerpt of Trial test., Clayon Green, Nov. 5, 2014).

from his conduct."[22] This is precisely what Jeffrey's counsel argued Jeffrey was guilty of. The fact that the jury found Jeffrey guilty of Manslaughter demonstrates how carefully the jurors considered the evidence and applied the law when reaching their decision, and supports the conclusion that even if there was an error, it was harmless.

Accordingly, I concur with the majority that the Superior Court did not abuse its discretion in denying a mistrial after Allen's remark, but I base my finding solely on the fact that this was not a close case.

## II.

For the future, it is also worth noting that this case presents some learning lessons. There was no reason for the State to ask the question it did about the benefits Allen was receiving, which he could answer truthfully only by admitting that he was receiving benefits as a participant in the witness protection program. Precisely because this was a subject that was discussed by the trial judge, the prosecution, and the defense,[23] best practice would have been for the parties to agree that the trial judge would tell the jury before Allen went on the stand that he had received a plea agreement from the State which contained certain benefits that the jury could and should take into consideration when determining the credibility

---

[22] Jury Instrs., 21, Nov. 18, 2014.
[23] App. to State's Answering Br. at B70–72 (Excerpt of Witness Protection Sidebar, Oct. 21, 2014); *id.* at B76a-76b (Excerpt of Trial Conference, Oct. 22, 2014).

9

of his testimony. Had that happened, this entire issue likely could have been avoided. Alternatively, the prosecution and defense could have agreed on the prosecutor's approach. But instead, the State asked an extremely sloppy and open-ended question on an issue that all parties knew in advance had to be handled with care. In fact, by asking Allen what benefits he was receiving *"without again looking at"* his plea agreement, the State focused Allen's mind on benefits outside the plea agreement, inviting the candid response Allen gave, which was that he was also receiving benefits as a participant in the witness protection program.[24]

Likewise, it is hard to look back on this case and understand how defense counsel for Otis and Jeffrey did not recognize that they were likely to come to a junction in the trial where they would be pointing fingers at each other's clients. After Allen's remark about being in witness protection, Jeffrey and Otis moved for severance in addition to a mistrial because they disagreed about how to deal with the harm created by the State eliciting testimony that Allen was in witness protection. Jeffrey wanted to cross-examine Allen about the financial benefits that he was receiving from being in witness protection to discredit him. Otis, however, did not want the fact that Allen was in witness protection—which underscored the State's theory that the Sure Shots are a danger to witnesses like the deceased Curry—to be discussed any further.

---

[24] App. to State's Answering Br. at B91 (Excerpt of Trial Test., Kelmar Allen, Oct. 24, 2014) (emphasis added).

10

But, what Otis and Jeffrey did not argue to the Superior Court was something far more troubling that would emerge only later in the case. Neither before trial, when Jeffrey initially sought severance, nor after Allen stated that he was in witness protection, did defense counsel argue that a mistrial or severance was required because Jeffrey and Otis would be pointing fingers at each other: Jeffrey, by suggesting Otis went to Eden Park to kill Curry and Jeffrey was just there by happenstance and got caught up in a melee during which he accidentally shot Kamara; Otis, by implying that he was not even present at Eden Park and suggesting Jeffrey killed both Curry and Kamara.

But, at closing arguments, that is exactly what happened. Jeffrey argued that he was not a member of the Sure Shots and he went to Eden Park innocently that day without any knowledge that Otis was going to kill Curry. Jeffrey's counsel joined the prosecution in telling the jury that Otis should be convicted of intentional murder when he stated:

> We know that the state of mind of Otis Phillip was intentional conduct. That is the best example of intent; walking up to someone, tapping them on the shoulder, firing two shots, and to believe some of the witnesses, Curry falls to the ground, he shoots him one more time for good matters, or Curry starts running and he shoots him another time, and he continues to shoot at him. That's intent. . . .[25]

---

[25] Trial Tr., 33–34, Nov. 19, 2014.

Jeffrey's counsel claimed that Jeffrey was merely "criminally negligent or reckless" for wildly firing his weapon.[26]

For his part, counsel for Otis flat out argued that there was a reasonable doubt that Otis was even at Eden Park when Curry and Kamara were killed, and instead he suggested that Jeffrey was present at Eden Park and was responsible for both shootings.[27] Otis's counsel stated that the night before the Eden Park shooting, several Sure Shots were at a nightclub where there was a gunfight, and "[i]nvolved in the gunfight, the evidence would show, is Jeffrey Phillips. Again, Otis Phillips isn't around."[28] The morning of the Eden Park shootings, Otis's Counsel stated that "[t]wo people -- two people -- leave Lamotte Street, according to Kelmar Allen: Jeffrey Phillips and Sheldon Ogle ... We do know Otis wasn't there."[29]

These are not compatible theories, and it strikes me as likely that counsel for Otis and Jeffrey knew before trial—or at least by the time Allen said he was in witness protection—that these theories could form the primary basis for their ultimate defense. Furthermore, counsel should have known that the fact that their clients share the same last name but are not related was likely to create additional

---

[26] *Id.*
[27] App. to Appellant's Opening Br. at A161–64 (Nov. 18, 2014 Excerpt of Closing Arg. of Otis Phillips).
[28] *Id.* at A161.
[29] *Id.* at A164.

12

confusion for the jury, especially where, as here, there are several other Sure Shots with the last name Phillips who are related to Otis but not Jeffrey. But, counsel did not raise this argument either time when they moved for severance during trial.

By failing to confer with each other outside of the presence of the State, and failing to present a timely severance or mistrial motion that focused on the possibility that Otis and Jeffrey would point fingers at each other, the defenses for Otis and Jeffrey left the trial judge to focus on weaker arguments for severance that the majority properly says the trial judge was within his discretion to consider not compelling enough to accept as justifying the costs and burden of separate trials. In fairness to the trial judge, he could not have known Jeffrey and Otis would ultimately implicate each other, and trial judges cannot be expected to focus on arguments that counsel do not present. But, although there was overwhelming evidence against Jeffrey and Otis, the resulting record is nonetheless concerning and could have justified reversal and the costs of two retrials in a closer case. Without underestimating the complexities both the State and defense counsel face in handling cases where members of gangs are alleged to have committed crimes in concert, the very importance and difficulty of the potential issues arising out of a joint trial would seem to counsel for early and timely identification of and focus on those issues so they can be addressed in a thoughtful, non-seat-of-the-pants manner.