IN THE SUPREME COURT OF THE STATE OF DELAWARE

GLENFORD BLACKWOOD,     §
          §
    Defendant Below,     § No. 246, 2022
    Appellant,     §
          § Court Below—Superior Court
    v.     § of the State of Delaware
          §
STATE OF DELAWARE,     § Cr. ID No. N1809011229
          §
    Appellee.     §

Submitted: August 11, 2023
Decided: October 11, 2023

Before **SEITZ**, Chief Justice; **LEGROW** and **GRIFFITHS**, Justices.

## ORDER

After consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)     At the conclusion of a ten-day trial in July 2021, a Superior Court jury found the defendant-appellant, Glenford Blackwood, guilty of two counts of first-degree murder, two counts of attempted first-degree murder, and four counts of possession of a firearm during the commission of a felony ("PFDCF"). The Superior Court imposed a life sentence for each of the murder and attempted murder offenses and a total of twenty years in prison for the PFDCF offenses. This is Blackwood's direct appeal. For the reasons discussed below, we affirm the judgment of the Superior Court.

## Facts

(2)     Sometime after 1:00 a.m. on June 17, 2018, Duncan Dorsey and his friend Vincent DiMenco were sitting in the front yard of Mr. Dorsey's home at 1 Lloyd Street in Wilmington, celebrating Mr. Dorsey's birthday.  Mr. Dorsey's fifteen-year-old daughter, Doris, was sitting in the family car, which was parked in the driveway, talking and playing games with a friend via FaceTime.  Mr. Dorsey's wife, whose name was also Doris Dorsey,[1] was inside the house.  As Mrs. Dorsey descended the stairs, she looked through a window and saw someone walking onto the property.  Not expecting any other visitors, she opened the door to find out what was happening.  Mr. Dorsey also noticed someone approaching, carrying a shotgun.  As he stood up to confront the person, the individual smiled,[2] cocked the shotgun, and fired into the car where Doris was sitting.  In an attempt to defend his daughter, Mr. Dorsey threw a chair at the shooter, who fired a second shot into the car.  After shooting into the car, the perpetrator also fired at least two more shots.  One struck DiMenco in the head as he tried to run away, killing him.  The other penetrated the front door, grazing Mrs. Dorsey's back, and proceeded through several walls and a cabinet before lodging in a shed in the back yard.

---

[1] To distinguish among the members of the Dorsey family, we refer to Duncan Dorsey as "Mr. Dorsey," to his wife Doris as "Mrs. Dorsey," and to their daughter as "Doris."

[2] Reporting on the homicide, the Delaware *News Journal* dubbed the unknown perpetrator the "Smiley Face Killer."

(3) Mr. Dorsey ran to a nearby fire station to call 911. The first 911 call was received at 1:26 a.m. New Castle County Police Department ("NCCPD") officers and other emergency personnel were dispatched to the crime scene; Doris was transported to Christiana Hospital for treatment of multiple gunshot wounds, where she was ultimately pronounced dead. Some officers began securing the scene and collecting evidence, including four shotgun shells. Officers found DiMenco's body after some time on the scene; he was pronounced dead at the scene. Officers obtained descriptions of the shooter from Mr. and Mrs. Dorsey at the scene. Each of the Dorseys was also interviewed at the police station on the morning of the shooting. The Dorseys stated that they did not recognize the shooter but described him, using various words and gestures, as a tall man with a large build, a bald head or short-cropped hair, and a wider, clean-shaven face.[3]

(4) As part of the investigation, NCCPD officers collected video surveillance from various residences and businesses. A motion-activated camera at 7 Lloyd Street, three houses down from the crime scene, captured a white SUV

---

[3] On June 21, 2018, after NCCPD identified Blackwood as a person of interest, a detective presented Mr. Dorsey with a six-person photographic lineup. The fourth photo in the array was Blackwood. A video recording of Mr. Dorsey's review of the photo array was played at trial. Mr. Dorsey did not identify Blackwood as the shooter, and in fact he identified certain features of the individuals shown in two other photos as similar to the shooter. On that same day, Mr. Dorsey also met with a composite sketch artist employed by NCCPD. A video recording of the meeting with the sketch artist was also played at trial. Mr. Dorsey was emotional and agitated during the meeting and struggled to select images from the sketch artist's "catalog" of facial features that he could identify as similar to the shooter's features.

traveling on Lloyd Street at 12:31 a.m., 12:32 a.m., and 1:19 a.m.  A sales manager at a GMC dealership reviewed still shots clipped from the 7 Lloyd video and identified the vehicle as a GMC Terrain SLE-2 model from between 2009 and 2017. Detectives then obtained a list of all white 2009-2017 GMC Terrains registered in Delaware.

(5)    On June 21, 2018, a detective visited a local Walmart store and determined that the store sold the same type of Federal brand, 12-gauge ammunition that officers had found at the crime scene.  The most recent sale of that ammunition had occurred on April 27, 2018.  Walmart required ammunition purchasers to provide a birthdate and had recorded the purchaser's birthday as August 21, 1986. Surveillance videos from the interior and exterior of the store from the date of the ammunition sale showed the purchaser to be a large-framed man who arrived in a white GMC Terrain with a license plate number beginning with PC14.  The registered address of one of the vehicles on the list of GMC Terrains, with a license plate number of PC146126,[4] matched the address of a man with a birthdate of August 21, 1986, Glenford Blackwood.

(6)    Other surveillance video footage captured on the night of the shooting appeared to show a white SUV traveling from an area near Blackwood's residence

---

[4] Another surveillance video that NCCPD later obtained from the Walmart store showed that the complete license plate number of the ammunition purchaser's vehicle was PC146126.

at approximately 12:26 a.m. on June 17, 2018, before appearing on the 7 Lloyd video at 12:31 and 12:32 a.m., and then returning to the area of Blackwood's residence at approximately 12:37 a.m. Additional footage appeared to show a white SUV traveling from the area of Blackwood's residence at approximately 1:13 a.m. and passing 7 Lloyd at 1:19 a.m., before the first 911 call at 1:26 a.m. As described in greater detail below, the State's theory that the white SUV was Blackwood's was corroborated by—and Blackwood's alibi defense was undermined by—data obtained from Blackwood's cell phone, cell phone service provider, and Google.

(7) Detectives developed a theory that Blackwood harbored a grudge against Mrs. Dorsey arising from an incident that had occurred in 2015. Blackwood was a loss prevention officer and greeter at a Family Dollar store in Wilmington. He was working in October 2015 when Mrs. Dorsey and an individual named Keith Whitaker arrived at the store in the Dorseys' car. Blackwood observed Whitaker shoplifting and confronted him. Blackwood was injured in an ensuing altercation during which Whitaker punched and kicked Blackwood, knocking him out, and tried to run Blackwood over with the Dorseys' car. Blackwood received medical treatment and workers' compensation related to his injuries. Whitaker was convicted of criminal charges in connection with the incident.

(8) On June 22, 2018, NCCPD officers executed a search warrant at Blackwood's residence. Blackwood and his wife were present. Officers seized a

5

pair of boots, which were later tested and determined to have particles characteristic of and consistent with gunshot residue on them, and Blackwood's cell phone. In a nightstand in Blackwood's bedroom, they found documents relating to the 2015 incident at the Family Dollar, including documents regarding Blackwood's medical treatment, a workers' compensation claim that he filed, and Whitaker's criminal charges from the incident. The paperwork included various handwritten notations, including "Duncan Dorsey," "owner passenger," and the 1 Lloyd Street address; and "Keith Whitaker, charged robbery, second felony, was in jail."

(9) Following the execution of the search warrant, officers transported Blackwood to NCCPD for questioning. Detective Eugene Reid, the lead investigator, read Blackwood his *Miranda* rights; Blackwood signed a form acknowledging those rights and agreed to speak to Detective Reid. The interview started after 7:00 a.m. and ended after 6:00 p.m., including time for photographs, fingerprinting, DNA collection, and administration of a lie-detector test for which Blackwood volunteered.

(10) Blackwood told Detective Reid that he drove his wife's white GMC Terrain to a swingers' party in Glen Mills, Pennsylvania, on the afternoon of June 16, 2018. He said that he arrived at the party after 4:00 p.m., the party ended at approximately 12:30 a.m., and he left at approximately 1:00 a.m. and went straight

6

home, arriving home between 1:15 and 1:18 a.m.[5] He insisted multiple times that he went straight home from the party and did not leave home again that night, and he denied ever having been on Lloyd Street.[6] Blackwood repeatedly implored Detective Reid to verify his alibi and suggested various ways that Detective Reid could do so. Blackwood denied ever having owned or fired a gun. He admitted that he had purchased 12-gauge shotgun ammunition at Walmart a few months earlier because he had planned to go target shooting with a friend, but stated that the plans were canceled and he had then misplaced the ammunition when cleaning out some winter clothes. When Detective Reid asked Blackwood if he knew Duncan Dorsey, Blackwood described the 2015 incident with Whitaker and Mrs. Dorsey at the Family Dollar. He denied harboring any ill-will toward the Dorseys; indeed, he claimed that Mrs. Dorsey had saved his life by intervening when Whitaker tried to hit Blackwood with the car.

(11) Detectives were able to verify certain aspects of Blackwood's statements about his activities on the night of the murder, but the evidence did not support the timeline that Blackwood provided. The host of the swingers' party testified that he hosted monthly parties at his house and that Blackwood had attended several of the parties. The host testified that the party on June 16, 2018, started

---

[5] *E.g.*, Appendix to Answering Brief at B-36, B-39, B-82-83, B-87-89, B-101, B-106.
[6] *E.g.*, *id.* at B-87-89, B-90-91, B-94-96.

between 4:00 and 5:00 in the afternoon. He stated that Blackwood attended the party, paid $60, and signed the guest list when he arrived. The guest list confirmed that Blackwood had signed in as "Glen" and written his phone number. But the party host further testified that all guests left by midnight and that he was in bed by 12:15 or 12:30 a.m.

(12) Blackwood's insistence that he went straight home after the party and did not leave home again that night also did not withstand further investigation. A former romantic partner of Blackwood's (the "Maryland Witness") testified that she and Blackwood had dated for approximately two years until sometime in 2017. After their relationship ended, they did not communicate until one night in June 2018, when Blackwood contacted her by phone and then visited her home in Chestertown, Maryland, arriving in a white SUV. She estimated that Blackwood spent two or three hours at her house that night.

(13) Data retrieved from Blackwood's smartphone also undermined Blackwood's statements regarding his whereabouts on the night of the murder. Special Agent William Shute of the Federal Bureau of Investigation's Cellular Analysis Survey Team testified regarding his analysis of data retrieved from Blackwood's cell phone, phone service provider, and Google. Special Agent Shute testified that Blackwood's phone used a cell tower near the swingers' party to handle

8

a call at 10:54 p.m. He testified that Google location data[7] showed that the phone was located at or near the party address until 12:08 a.m., when it began leaving that location and moving down Route 202, reaching the area of Route 202 and Interstate 95 at 12:18 a.m. and continuing toward the area of the crime scene between 12:24 and 12:30 a.m. He further testified that the phone was on Lloyd Street at 12:32:05 and 12:32:21 a.m. The phone then began moving back toward Blackwood's residence, arriving at the residence by 12:40 a.m. The location data points and timing corresponded with the movement of the white SUV on the surveillance footage, including the video from 7 Lloyd Street that captured the white SUV at 12:31 and 12:32 a.m.

(14) Special Agent Shute testified that the phone was at Blackwood's residence from 12:40 a.m. until 1:11 a.m. Between 1:11 and 1:31 a.m., no location data registered. Special Agent Shute testified that the lack of location data indicated that the phone was powered off or set to "airplane mode" during that period. At 1:31

---

[7] Special Agent Shute testified regarding maps that he created based on his analysis of the Google location data. The maps showed the location of the cell phone at various times on June 16-17, 2018, in relation to the party, Blackwood's residence, the various surveillance videos of the white SUV, Lloyd Street, the Maryland Witness's residence, and routes between those locations. He stated that Google derives location data by using GPS information and Wi-Fi location information, and that Google location data is highly precise, with an accuracy radius of 10 meters. He further testified that Google collects location data approximately every minute when the phone is powered on. In contrast, location information based on cell phone tower locations is less precise, indicating locations at a neighborhood level of precision. Most of Special Agent Shute's analysis was based on Google location data; only the analysis regarding the 10:54 p.m. call was based on cell phone tower location information.

a.m., approximately five minutes after the first 911 call, the phone began registering data again. It had moved from the area of Blackwood's residence, beyond the crime scene, and begun traveling south toward Christiana Hospital, registering very near the hospital at 1:34 a.m. Between 1:34 and 1:54 a.m., there was another gap in the location data. When the location data reappeared at 1:54, it reflected that during that second twenty-minute black-out period, the phone had traveled approximately two miles, from the hospital area to a location near Route 4 and Route 896. After 1:54 a.m., the phone began moving south, arriving at the Maryland Witness's address in Chestertown, Maryland, at 2:52 a.m.

(15) Other data obtained from Blackwood's phone and Google also supported a conclusion that Blackwood had knowledge of and opportunity to commit the crime. The phone was used to conduct several internet searches on June 20 and 21, 2018—before police identified him as a suspect on June 21 and executed the search warrant at his residence on June 22—concerning which states have the death penalty and "Smiley Face Killer." The phone also contained a photograph, taken August 24, 2017, of Blackwood holding a shotgun.

(16) Blackwood testified at trial. He said that he drove his wife's white GMC Terrain to the party in Glen Mills, Pennsylvania, on June 16, 2018. He testified that he told Detective Reid during the interview that the party ended at midnight, that he left between 12:30 a.m. and 12:40 a.m. and went straight home,

and that he arrived home between 1:05 a.m. and 1:07 a.m. He claimed that someone had spliced the video of his interview to make it appear that he had told Detective Reid that he stayed at the party later. He acknowledged that he had lied to Detective Reid about going straight home. He testified that he was at home from 12:40 a.m. until 1:11 a.m. and then had left for Chestertown, Maryland, stopping near Christiana Hospital to get gas. He acknowledged that some of the surveillance videos from the night of the murder depicted his vehicle. He denied that the 7 Lloyd video showed his vehicle and insisted that he had never been on Lloyd Street. He testified that he always carried his phone with him and asserted that the phone had failed to capture location data during the two black-out periods because it had run out of power.

(17) Blackwood testified that he had heard that the media had dubbed the perpetrator the "Smiley Face Killer" and admitted that he had conducted the "Smiley Face Killer" and death penalty searches on his phone. He further testified that he had withdrawn $7,000 and sent it to Jamaica on the day after the murder because he wanted to buy a house there. He also admitted that he had told Detective Reid that if he had committed the murder, they would have to catch him in Jamaica. He denied feeling any ill-will toward the Dorseys in connection with the Family Dollar incident.

(18) After more than two days of deliberations, the jury returned guilty verdicts on all counts. After trial but before sentencing, Blackwood sought to

11

proceed *pro se*. Defense counsel then moved to withdraw. After a hearing, the Superior Court granted counsel's motion to withdraw and appointed new counsel. Several months later, Blackwood again sought to proceed *pro se*. After a hearing, the court granted the motion to proceed *pro se* and continued the sentencing date. The Superior Court sentenced Blackwood on June 24, 2022, and Blackwood filed this appeal *pro se*. Blackwood has raised several issues for consideration by the Court. We address each of his arguments in turn.

### *Denial of Motion to Suppress Smartphone Evidence*

(19)   On June 22, 2018, while Detective Reid was questioning Blackwood after the execution of the search warrant at Blackwood's residence, another detective prepared and submitted an application and affidavit to search the contents of Blackwood's cell phone. A magistrate issued the warrant. As discussed in greater detail below, Blackwood encouraged Detective Reid during the June 22 interview to look on the phone for information to verify Blackwood's alibi, and he provided Detective Reid with the passcode to access the phone.[8] On June 27, 2018, Detective Reid and another officer went to Blackwood's residence and obtained his written consent to search the contents of the phone.

(20)   On July 15, 2019, defense counsel filed a motion to suppress, arguing that NCCPD obtained evidence from Blackwood's cell phone pursuant to an

---

[8] *E.g.*, Appendix to Answering Brief at B-62.

unconstitutional search warrant. A later submission identified the evidence that Blackwood sought to suppress as the location data from June 16-17, 2018, the internet search history from June 17-22, 2018, and the photograph of Blackwood holding a shotgun. The motion argued that the warrant application did not establish probable cause to search his phone or allege a sufficient nexus between the murders and the cell phone. The motion also argued that the warrant authorized a search of an overly broad range of file types and dates and therefore constituted a general warrant. Finally, the motion argued that the warrant authorized a search of file types that exceeded the scope of file types that the application even sought to search.

(21) In opposition to the motion, the State argued that the probable cause and particularity requirements were satisfied at least to the extent that the warrant authorized a search for communications and location data. To the extent that the application or warrant were overbroad as to a search for other information, the State argued that the resulting evidence should not be suppressed because Blackwood had consented to a search of the entire contents of the phone and NCCPD had an independent source for the location data and internet search history—a subpoena to Google.

(22) The Superior Court held an evidentiary hearing on the motion to suppress on November 18, 2019, during which Blackwood and Detective Reid testified. After additional submissions from counsel and a second evidentiary

13

hearing on January 17, 2020, the Superior Court denied the motion to suppress. The court determined that the warrant satisfied the particularity requirement[9] but was "too broad for the probable cause upon which it was based."[10] As to the warrant's overbreadth, the court concluded that (i) even if the application and affidavit established probable cause to search call logs, SMS messages, and MMS messages, the warrant's authorization to do so for a period extending from October 26, 2015, to June 22, 2018, was broader than the probable cause on which it was based;[11] (ii) the authorization to search images on Blackwood's phone was not supported by probable cause because it was based solely on generalized statements that cell phones can capture photographs and videos and perpetrators often take photographs and videos before and after their crimes;[12] and (iii) although the application and affidavit established probable cause to search communications and location data, the date range for the search was overly broad.[13] The Superior Court determined that suppression was not warranted, however, because Blackwood voluntarily consented

---

[9] See Taylor v. State, 260 A.3d 602, 615 (Del. 2021) (articulating the "constitutional and statutory requirements that [a search warrant] describe the items to be searched for and seized with as much particularity as the circumstances reasonably allow and is no broader than the probable cause on which it is based").

[10] See State v. Blackwood, 2020 WL 975465, at *3-5 (Del. Super. Ct. Feb. 27, 2020) (addressing the breadth and particularity of the warrant to search Blackwood's cell phone).

[11] Id. at *4.

[12] Id.

[13] Id. at *5.

to a search of the entire contents of the phone.[14] The Superior Court also concluded that suppression was not required because NCCPD also obtained the evidence from independent sources, such as obtaining location data by subpoena sent to Google.[15]

(23) Blackwood argues that the Superior Court erroneously denied the motion to suppress. He argues that the warrant was overly broad as to the sources and date range to search, did not satisfy the particularity requirement, and was a general warrant. The State argues that the Superior Court correctly denied the motion to suppress because Blackwood consented to the search and the consent extended to the entire contents of the phone. Blackwood argues that his consent was not voluntary and that the scope of the consent that he provided during the police interview was limited to obtaining the phone number of the party host, in order to verify Blackwood's alibi.

(24) This Court reviews the Superior Court's denial of a motion to suppress, after an evidentiary hearing, for abuse of discretion.[16] We review the trial court's legal conclusions *de novo*.[17] "We review the Superior Court's factual findings to

---

[14] *Id.* at *6-7.

[15] *Id.* at *8.

[16] *McAllister v. State*, 807 A.2d 1119, 1122 (Del. 2002).

[17] *Id.*; *see also Buckham v. State*, 185 A.3d 1, 16 (Del. 2018) ("As for Buckham's challenge to the warrant's particularity and breadth, we review those questions *de novo*."); *Wheeler v. State*, 135 A.3d 282, 295 (Del. 2016) ("We also apply *de novo* review to the Superior Court's legal conclusions when reviewing the denial of a motion to suppress.").

determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous."[18]

(25)   We affirm the Superior Court's denial of the motion to suppress on the basis that Blackwood consented to a search of the entire contents of his smartphone. Article I, Section 6 of the Delaware Constitution and the Fourth Amendment to the United States Constitution "protect the right of persons to be secure from 'unreasonable searches and seizures.'"[19]  "Generally, searches and seizures are *per se* unreasonable . . . unless authorized by a warrant supported by probable cause."[20] There is a well-recognized exception to the warrant requirement, however, for searches that are conducted with a person's valid consent.[21] Consent may be express or implied.[22]  This waiver of constitutional rights need not be knowing and intelligent, but it must be voluntarily given.[23]  "To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent, including (1) knowledge of the constitutional right to refuse consent; (2)

---

[18] *Wheeler*, 135 A.3d at 295 (internal quotations omitted).

[19] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (quoting U.S. CONST. amend. IV; DEL. CONST. art. 1, § 6)).

[20] *Id.* (internal quotations and alterations omitted); *see also Higgins v. State*, 2014 WL 1323387, at *2 (Del. Apr. 1, 2014) ("A warrantless search is deemed *per se* unreasonable unless that search falls within a recognized exception.").

[21] *Flonnory*, 109 A.3d at 1063; *Higgins*, 2014 WL 1323387, at *2; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("[A] search conducted pursuant to a valid consent is constitutionally permissible."); *id.* ("[A] search authorized by consent is wholly valid.").

[22] *Cooke v. State*, 977 A.2d 803, 855 (Del. 2009).

[23] *Id.*

16

age, intelligence, education, and language ability; (3) the degree to which the individual cooperates with police; and (4) the length of detention and the nature of questioning, including the use of physical punishment or other coercive police behavior."[24]  Moreover, although knowledge of the right to refuse consent is one factor to be taken into account when determining whether consent was voluntary, proof of such knowledge is not a "necessary prerequisite" to a voluntary consent.[25] When the State relies upon consent to demonstrate the lawfulness of a search, the State has the burden of proving that the consent was voluntarily given.[26]

(26)  We agree with the Superior Court's conclusion that Blackwood voluntarily consented to the search of the phone during the June 22, 2018 interview at NCCPD.  Blackwood confirmed to Detective Reid that it was his Samsung Galaxy phone that officers had seized during the search of his residence that morning.  After telling Detective Reid that he had been at a party at the time of the murders and that he had previously contacted the party host on Craigslist, he encouraged Detective Reid to verify his alibi by calling the party host and said that the phone contained the host's contact information.  Following discussion of other matters, Detective Reid said that he was going to go call the party host; Blackwood responded by

---

[24] *Id.*

[25] *Schneckloth*, 412 U.S. at 232-33, 234.

[26] *Id.* at 222; *Higgins*, 2014 WL 1323387, at *2.

volunteering the pattern passcode that was necessary to gain access to the phone.[27] Hours later, when Detective Reid said that the officers had trouble using the pattern passcode, Blackwood entered the passcode for him and then again showed him how to enter it.[28] Detective Reid then asked Blackwood for the phone number for that cell phone, and Blackwood told him.[29]

(27) Later in the day, Detective Reid challenged Blackwood regarding his alibi by referring to information obtained from the phone, such as where the cell phone was "pinging" during the night of the murders.[30] Detective Reid also confronted Blackwood with other information obtained from the phone, including asking why Blackwood had conducted searches concerning which states had the death penalty.[31] Blackwood attempted to explain or rebut the information presented, but did not question why or under what authority officers were searching his phone or otherwise suggest that he had not consented to the search. He even offered additional information for the officers to look for on his phone, saying that Detective Reid should verify that he was on his home Wi-Fi and using "Tag" to text a woman known as "Love3D" between 2:00 a.m. and 3:15 a.m.[32]

---

[27] Appendix to Answering Brief at B-62-63.

[28] *Id.* at B-70.

[29] *Id.*

[30] *Id.* at B-85, B-87.

[31] *Id.* at B-86, B-97-98.

[32] *See id.* at B-90-91, B-98.

(28) Examining the totality of the circumstances, it is apparent that Blackwood's consent during the interview was voluntary. Blackwood was thirty-seven years old, and he wrote and spoke English. He was a legal resident of the United States, having immigrated to Delaware approximately six years earlier. He held a full-time job in retail loss prevention; had some experience with the criminal-justice system; expressed interest in legal issues and legal- or law-enforcement-related entertainment; and said that he had previously tried to become a police officer. His responses to Detective Reid's questions—such as challenging Detective Reid to show him a photo that captured his license plate when he was confronted with images of the white SUV—also demonstrated his awareness of concepts such as the evidentiary value of the information that Detective Reid presented to him. Although the interview at the NCCPD was quite lengthy, Detective Reid remained calm and civil, even when expressing doubt about Blackwood's truthfulness. Detective Reid did not engage in or threaten physical harm to coerce consent— indeed, Blackwood volunteered his passcode. Nor did Detective Reid say or imply that he had a warrant to search the phone.[33] Blackwood was very cooperative,

---

[33] *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."); *see also United States v. Parrish*, 942 F.3d 289, 294-95 (6th Cir. 2019) (discussing *Bumper* and affirming trial court's determination that defendant consented to a search of his cell phone).

repeatedly saying that he would "do anything" to clear himself of the accusations and suggesting various investigatory steps that the detective could take.

(29) We also conclude that the scope of Blackwood's consent extended to the entire contents of the phone. The scope of a search authorized by consent is governed by the language used in giving the consent,[34] and consent may be express or implied.[35] Blackwood told Detective Reid how to access the phone, accessed the phone for Detective Reid while the detective observed, and then again showed Detective Reid how to enter the passcode, without expressing any limitations on what content Detective Reid could access. Viewed in the context of Blackwood's repeated entreaties to verify his alibi and to contact the party host, Blackwood's actions indicate that his consent extended to the entire contents of the phone, and certainly, as the Superior Court determined, to the location data, data from communications applications, and contact information.[36] Our conclusion that the scope of Blackwood's consent extended to the entire contents of the phone is buttressed by Blackwood's repeated insistence that he would "do anything" to prove his innocence, his suggestions of additional information to seek, and his failure to raise any issues concerning the scope of his consent when Detective Reid began

---

[34] *Ledda v. State*, 564 A.2d 1125, 1129 (Del. 1989); *see also id.* (holding that the scope of a consent to search a vehicle was as broad as the form that the driver signed consenting to a "complete and thorough search" of the vehicle).

[35] *Cooke v. State*, 977 A.2d 803, 855 (Del. 2009).

[36] *Blackwood*, 2020 WL 975465, at *6.

referring to the location data and search history. Moreover, five days after the interview in which Detective Reid indicated to Blackwood that he suspected him of murder and pointed to unfavorable evidence on the phone, Blackwood signed a written consent authorizing a search of the entire contents of the phone, without expressing any concern that the scope of the earlier search had exceeded the scope of his consent.

(30) For these reasons, we affirm the Superior Court's determination that Blackwood voluntarily consented to a search of the entire contents of his cell phone. Because of our conclusions regarding consent, we need not address Blackwood's challenges to the warrant.[37]

### *Alleged* **Brady** *Violation*

(31) Blackwood also contends that the prosecution withheld evidence in violation of *Brady v. Maryland*.[38] Because Blackwood did not raise this claim in the Superior Court, we review for plain error.[39] To constitute plain error, the error must so clearly prejudice substantial rights as to jeopardize the fairness and integrity of the trial process.[40] There are three elements of a *Brady* violation: (i) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (ii)

---

[37] *See Schneckloth*, 412 U.S. at 222 ("[A] search authorized by consent is wholly valid."); *Flonnory*, 109 A.3d at 1063 (stating that consent is an exception to the warrant requirement).

[38] *Brady v. Maryland*, 373 U.S. 83 (1963).

[39] *Goode v. State*, 136 A.3d 303, 312 (Del. 2016).

[40] *Id.*

21

the State suppressed that evidence; and (iii) suppression of the evidence prejudiced the defendant.[41] We find no error because Blackwood has not identified any nondisclosed *Brady* material.

(32) When the officers presented Mr. Dorsey with the photo array, Mr. Dorsey said that the shooter had certain features—such as a larger build and similar head shape—that were like the features of the individuals in the third and sixth photos. Mr. Dorsey did not identify Blackwood, whose photo was fourth in the array, as the shooter. Blackwood claims that, because Mr. Dorsey failed to identify Blackwood as the shooter, the State then "altered and manipulated" Mr. Dorsey's statement before producing it to defense counsel.

(33) Blackwood has failed to identify any exculpatory or impeaching evidence that the State withheld. Blackwood concedes that the video of Mr. Dorsey's review of the photo array was produced to the defense, and the video was played for the jury. Detective Reid testified at trial that Mr. Dorsey was unable to identify the shooter. The jury also heard evidence of the varying descriptions of the perpetrator that the Dorseys provided, saw video of the Dorsey interviews, and viewed the video of Mr. Dorsey's meeting with a police sketch artist, during which he struggled to describe the shooter with clarity and to identify the shooter's features

---

[41] *Wilson v. State*, 271 A.3d 733, 740 (Del. 2022).

with the tools used by the police sketch artist. We find no plain error as to Blackwood's *Brady* claim.

### *Video of Blackwood Interview*

(34)  Blackwood also asserts that the State and the trial court violated his Sixth Amendment right to a fair trial because the prosecution presented to the jury an "altered and manipulated" video of Blackwood's interview at NCCPD. Specifically, Blackwood alleges that the State altered the video of his interview to make it appear that Blackwood told Detective Reid that he left the swingers' party after 1:00 a.m. and arrived home between 1:15 and 1:18 a.m., in contrast with Blackwood's testimony at trial that he told Detective Reid that he left the party at approximately 12:30 a.m. and arrived home between 1:05 a.m. and 1:07 a.m. He contends that the Superior Court erred by not excluding the video from evidence and by providing a redactions instruction to the jury.

(35)  The parties agreed to redact the video of the interview to shorten the lengthy interview for trial and to remove certain material that was unfavorable to Blackwood. When he took the stand, Blackwood asserted that the State had "spliced" the video to make it appear that he told Detective Reid that he had left the party after 1:00 a.m., pointing out that the video was "skipping." Counsel then went to side-bar to discuss a redactions instruction, which the court provided to the jury.

Blackwood's counsel did not ask the court to suppress the video as redacted or claim that the video was altered or manipulated beyond the agreed-upon redactions.

(36) We find no merit to Blackwood's claims. He has not provided any evidence that the State altered or manipulated the video, other than applying the approved redactions. Nor does he assert that the State did not provide the defense with an unredacted copy of the video, such that the defense could have argued to the Superior Court that the State had spliced the video, if that were true.

### *Alibi Instruction*

(37) Finally, Blackwood contends that the Superior Court erred by providing an alibi instruction. Although unclear, it appears that Blackwood's argument is that his trial testimony was that he did *not* claim to be at the swingers' party at the time of the murder, and the court therefore should not have instructed the jury regarding an alibi claim. We find no merit to this argument. The defense did not object to an alibi instruction, and the evidence presented at trial was sufficient to support such an instruction.[42] We discern no error in the instruction as given, nor do we discern how the omission of the instruction would have changed the result at trial. Even without the instruction, the jury would have been presented with Blackwood's statements to Detective Reid about his whereabouts on the night of the murder, his conflicting

---

[42] *See generally Brown v. State*, 958 A.2d 833, 839 (Del. 2008) ("[A] trial judge must give the jury an alibi instruction where sufficient credible evidence is presented and a timely request is made.").

statements at trial, and the strong circumstantial evidence that he was actually on Lloyd Street that night.[43]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice

---

[43] In his reply brief, Blackwood asserts for the first time that his conviction should be reversed because the Superior Court pressured the jury to reach a guilty verdict after they sent out a note saying that they could not reach a unanimous verdict and felt that further deliberation would not help. "This Court's rules provide that an appellant waives any argument not raised in the body of his opening brief." *White v. State*, 2023 WL 3675801, at *2 (Del. May 25, 2023). In any event, we find no plain error in the Superior Court's provision of an *Allen* charge to the jury. *See Jenkins v. State*, 401 A.2d 83, 87 (Del. 1979) ("Supplementary instructions which encourage the jury to reach a verdict, sometimes referred to as an 'Allen charge' or 'dynamite charge,' are generally proper." (citing *Allen v. United States*, 164 U.S. 492 (1896)); *Collins v. State*, 56 A.3d 1012, 1020 (Del. 2012) (reviewing challenges to an *Allen* charge that were not raised at trial for plain error).